VERNON MOLBREAK AND JEAN D. MOLBREAK, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8226-71, 8248-71. Filed December 26, 1973.

*Vernon Molbreak*, for the petitioners.
*Robert F. Brunn*, for the respondent.

STERRETT, *Judge:* Respondent determined deficiencies in the income taxes of the petitioners as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Vernon Molbreak and Jean D. Molbreak | 8226-71 | 1967 | $3,400.84 |
| Harvey E. Schmidt and Adeline Schmidt | 8248-71 | 1967 | 3,568.49 |
|  |  | 1968 | 907.66 |

The sole issue presented for our consideration is whether the petitioners held the parcel of real estate which they sold on May 19, 1967, for more than 6 months within the meaning of section 1223 of the Internal Revenue Code of 1954 [2] so that they are entitled to treat the profit on the sale of a portion of the real estate as long-term capital gain.

[1] Proceedings of the following petitioners are consolidated herewith: Harvey E. Schmidt and Adeline Schmidt, docket No. 8248-71. A motion to consolidate the above two cases and of the related taxpayer, Leonard W. Schmock, et ux., docket No. 8233-71, was granted by the Court but the latter docketed case was continued for settlement purposes by the trial judge. The other two cases, docket Nos. 8226-71 and 8248-71, were submitted for trial.

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

All of the facts, together with the exhibits, have been stipulated and are so found. The Molbreak and Schmidt cases were submitted fully stipulated but, due to the problem of securing timely stipulations of fact from the petitioners in these cases, separate but substantially identical stipulations of fact were filed in the consolidated proceedings. The parties have agreed on the following statements in the stipulations:

Vernon Molbreak and Jean D. Molbreak, during the taxable year 1967 and at the time of the filing of their petition herein, resided in Madison, Wis.

Harvey E. Schmidt and Adeline Schmidt, during the taxable years 1967 and 1968 and at the time of the filing of their petition herein, resided in Madison, Wis.

Vernon Molbreak, Jean D. Molbreak, Harvey E. Schmidt, and Adeline Schmidt filed their returns for the taxable years involved with the district director of internal revenue, Milwaukee, Wis.

Jean D. Molbreak and Adeline Schmidt are involved herein only because they filed joint Federal income tax returns with their husbands; and hereinafter petitioners will refer to Vernon Molbreak and Harvey E. Schmidt.

Petitioner Vernon Molbreak is an attorney.

Molbreak, Harvey Schmidt, and Leonard Schmock, all of Madison, Wis., formed a real estate corporation, Westshore, Inc., a Wisconsin corporation, with its principal place of business at 4010 University Avenue, Madison, Wis. Westshore, Inc., was formed to enter into a lease of 6 acres of real property. The lease contemplated was entered into on August 19, 1960. The lessor was Mariam Leuk, a.k.a. Mariam L. Luek, hereinafter called Luek.

The lease agreement between Luek and Westshore, Inc., lessee, reads, in pertinent part:

CLAUSE 3-Term—To have and to hold the above described premises unto the Lessee for the period of ninety-nine (99) years commencing on the 15th day of September, 1960, and ending on the 14th day of September, 2059.

CLAUSE 4-Rental—Lessee hereby covenants and agrees to pay to Lessor as rent for the aforesaid premises the sum of Eight Thousand Dollars ($8,000.00) per annum, in coin of the realm and at such office of the Lessor or her agent as the Lessor may from time to time designate. Each years rental shall be payable on September 15th.

CLAUSE 5-Taxes and Assessments—In addition to the rental hereinbefore provided to be paid, Lessee further covenants and agrees to bear, pay and discharge all taxes, assessments, rates, charges, and all levies general and special, ordinary and extraordinary of any name, nature and kind whatsoever, which may be fixed, charged, levied, assessed, or otherwise imposed upon said premises or upon any or all building or improvements thereon, but said Lessee shall not be

required to pay income taxes or any inheritance or succession taxes which may at any time during the term of this Lease be required to be paid upon any gift, devise, deed, mortgage, descent or other alienation of any part of or all of said leased premises and property except as hereinafter provided in the event of purchase by the Lessee. Lessor and Lessee shall prorate all taxes, assessments and utilities for the current year.

\* \* \* \* \* \* \*

CLAUSE 10-Option to Purchase—Lessee is hereby granted the option at any time during the continuance of this Lease of purchasing the fee of the aforesaid premises for the sum of Two Hundred Thousand Dollars ($200,000.00), together with that sum which would reimburse Lessor for income taxes assessed against her as a result of this sale. Lessee is hereby granted a further option to purchase the demised premises for the sum of Two Hundred Thousand Dollars ($200,-000.00), payable in equal annual installments over a period of fifteen (15) years with interest at the rate of four percent (4%) per annum computed on the unpaid balance. Under this option there shall be no reimbursement for income taxes payable by the Lessor as a result of said sale.

Sale of the premises in parcels less than the whole shall be arranged by mutual consent of the parties only.

\* \* \* \* \* \* \*

CLAUSE 12-Repair and Maintenance of Buildings—Lessee agrees to keep the said buildings now in existence and any new buildings to be erected in good condition and repair, reasonable wear and tear excepted.

The aforesaid lease agreement did not contain a subordination clause. Westshore, Inc., found it difficult to develop the subject of the lease without such a clause which would subordinate the interest of Luek or her interest under the option to purchase. On January 20, 1964, Luek entered into an agreement with Westshore, Inc., under which she agreed to subordinate her interest in the real property to any mortgage placed thereon by Westshore, Inc., in consideration of $1.

Luek passed away November 12, 1964. The inventory of the Luek estate in the Dane County Probate Court of the State of Wisconsin listed the value of the 6 acres subject to the August 19, 1960, lease as $120,000.

Luek bequeathed her interest in the real property to a trustee, William E. Sieker, an attorney in Madison, Wis. Sieker, hereinafter referred to as trustee, was directed to collect the rents under the lease of August 19, 1960, and to enforce the provisions of said lease whenever it became necessary. The trustee was directed to distribute the rents to various named persons during their natural lives. The will of Luek bequeathed the remainder interest under the aforesaid lease "outright, absolutely, and in fee simple" to the board of trustees for the Shriners Hospital for Crippled Children, St. Louis, Mo.

The trustee on March 17, 1967, petitioned the Dane County Probate Court of the State of Wisconsin and represented that Westshore, Inc.,

had tendered to the trustee an offer to purchase a portion (1.3 acres or the westerly 125 feet) of the property that was the subject matter of the aforesaid lease. This offer on Westshore, Inc.'s part related to the 125 feet of the premises known as Blackhawk Cabins and was in the amount of $46,000 cash. The trustee's petition recited that said $46,000 in cash was arrived at by taking the square-foot area of the westerly 125 feet of the premises subject to the aforementioned lease to the whole area of the premises subject to the lease.

The trustee's petition further represented that the offer to purchase on the part of Westshore, Inc., contained a request that the trustee consent and agree to continue said lease between the Mariam Luek estate and Westshore, Inc., under the same terms and conditions except that the "lessees shall be Vernon Molbreak, Leonard Schmock and Harvey E. Schmidt substituted for Westshore, Inc." This offer to purchase further requested that the annual lease rental be reduced as the percentage of land remaining bore to the total rental. This offer upon the part of Westshore, Inc., also requested the trustee to consent to the liquidation of Westshore, Inc., and to the substitution of Molbreak, Schmock, and Schmidt for the lessee, Westshore, Inc.

The trustee on March 17, 1967, did request the court to approve the sale of the westerly 125 feet of the premises for the sum of $46,000. The trustee further requested the court to continue the lease between the Mariam Luek trust estate and Westshore, Inc., in the names of Molbreak, Schmock, and Schmidt under the same terms and conditions of the original lease dated August 19, 1960, and at a reduced rental rate computed as the percentage of the land retained bears to the total ground.

The Dane County Probate Court ordered a hearing on the trustee's petition to be held in Madison, Wis., on April 3, 1967, or as soon thereafter as possible.

The Arkansas Bank & Trust Co., executor of the estate of Luek, in response to the trustee's petition informed the court that the last sentence of clause 10 of said lease agreement expressly provided that "Sale of the premises in parcels less than the whole shall be arranged by mutual consent of the parties only," and requested the trustee to satisfy the court that he was entitled to sell a part of the leased premises. The Dane County Probate Court held a hearing on the trustee's petition on April 3, 1967, which was adjourned to April 7, 1967.

Molbreak filed a brief on April 6, 1967, with the Dane County Probate Court in which he alleged that Westshore, Inc., had elected to exercise the option in the aforesaid lease as to part of the 6 acres of real estate covered therein. Molbreak also alleged that the trustee was a substituted party for the deceased lessor and as such the trustee was

entitled to exercise his consent to a partial sale of the leased premises.

On April 21, 1967, the court issued an order denying the trustee's petition for approval of a sale of a part of the leased premises on the ground that the Shriners Hospital for Crippled Children, held to be a party to the aforesaid lease, had not consented to the sale of less than the whole of the parcel as provided by clause 10 of the lease.

Westshore, Inc., on April 27, 1967, entered into a plan for liquidation.[3] At the time of the liquidation, the following represented the interests of the stockholders:

| Name | Number of shares | Acquired |
|---|---|---|
| Harvey Schmidt | 15 | 12/20/60 |
| Do | 42½ | 2/25/63 |
| Leonard Schmock | 50 | 12/20/60 |
| Do | 7½ | 5/1/61 |
| Vernon Molbreak | 50 | 12/20/60 |
| Do | 7½ | 5/1/61 |

The directors of Westshore, Inc., as of April 27, 1967, were Vernon Molbreak, Leonard Schmock, and Harvey Schmidt. Molbreak, acting chairman of the meeting held on that date, announced that the purpose of the meeting was to discuss and act upon a proposal to dissolve and liquidate Westshore, Inc. The tax consequences to Westshore, Inc., and to its stockholders (Molbreak, Schmock, and Schmidt), which would result from the liquidation and distribution of the assets of Westshore, Inc., were discussed at said meeting.

Molbreak, president of Westshore, Inc., made a report with respect to the financial condition of Westshore, Inc. The stockholders expressed a desire to liquidate and distribute the assets of Westshore, Inc., since the corporation's assets had sharply appreciated in value since acquisition. It was resolved that the corporation, through its officers, would proceed to liquidate under section 333 of the Internal Revenue Code of 1954 and transfer its assets to its stockholders within the calendar month of April 1967.

Accordingly, the stockholder-directors adopted the following resolution:

I. Within thirty (30) days after the date of this meeting, there shall be filed Form 966 with the District Director of Internal Revenue, Milwaukee, Wisconsin, attaching thereto, a certified copy of this resolution, indicating that the stockholders and directors have adopted a plan of liquidation, pursuant to Section 333, Internal Revenue Code of 1954.

II. The stockholders shall prepare and file within thirty (30) days of this meeting, Form 964 in duplicate with the District Director of Internal Revenue, Milwaukee, Wisconsin, thereby electing the benefits of Section 333, Internal Revenue Code of 1954.

---

[3] The plan of liquidation is not in evidence.

III. That the corporation, by its duly authorized officers, proceed to liquidate and transfer the assets and liabilities to the stockholders in cancellation and redemption of the capital stock within the calendar month of April, 1967.

IV. That as soon as practical after the distribution and transfer of the assets and liability to the stockholders in exchange for their capital stock, the corporation shall file a certificate for the dissolution of the Corporation pursuant to the provisions of the Wisconsin Corporation Law, and that the officers of the Corporation are hereby authorized to execute any and all documents necessary to effectuate such dissolution.

V. That the officers and directors be and they are hereby empowered, authorized and directed to proceed in accordance with the resolution hereby adopted by the stockholders and directors, said officers and directors being authorized to adopt any subsequent resolutions to effectuate the intent of the stockholders and directors to liquidate the Corporation in accordance with a plan of liquidation adopted pursuant to Section 333, Internal Revenue Code of 1954.

On April 28, 1967, the leasehold interest of Westshore, Inc., was assigned by the corporation to Vernon Molbreak, Leonard Schmock, and Harvey E. Schmidt.

The trustee of the Luek estate (the lessor) entered into an agreement dated May 15, 1967, with Molbreak, Schmock, and Schmidt, the assignees of Westshore, Inc. This instrument stated that Molbreak, Schmock, and Schmidt were exercising their "option" to purchase the land for $200,000 and that the trustee agreed to sell them the land for this price. The $200,000 price was to be payable as follows: $46,000 payable on closing and a note secured by a real estate mortgage in the amount of $154,000 on the 6 acres that was the subject of the lease dated August 19, 1960, except for the westerly 125 feet thereof. Upon payment of the $46,000, Molbreak, Schmock, and Schmidt were to secure a deed from the trustee for the westerly 125 feet. This agreement provided that it was not considered to be final or binding until it was approved by the board of trustees for the Shriners Hospital for Crippled Children in Chicago, Ill. The subordination agreement of January 20, 1964, was declared to be null and void without any effect.

The Dane County Probate Court on May 15, 1967, approved and ordered the sale contemplated by this May 15, 1967, agreement. A written consent by the board of trustees of the Shriners Hospital for Crippled Children had been filed with the court.

On May 16, 1967, the trustee made a conveyance of the westerly 125 feet of the 6-acre parcel to Molbreak, Schmock, and Schmidt.

On May 19, 1967, Molbreak, Schmock, and Schmidt conveyed 1.3 acres (the westerly 125 feet) of the 6 acres covered by the lease of August 19, 1960, to Westshore, Inc., to Kenneth E. Alles.

On their income tax returns for the taxable years 1967, petitioners reported the profits on the sale of the land involved herein as a long-term capital gain. Respondent, in his statutory notice of deficiency, determined that petitioners realized a short-term capital gain in regard to the sale of land from their Westshore tract.

OPINION

The sole issue for our determination is whether the profit realized by the petitioners through the sale on May 19, 1967, of 1.3 acres of land to Kenneth E. Alles should be taxed as short-term or long-term capital gain.[4] The 1.3 acres was part of a larger tract which Westshore, Inc., held under a 99-year lease, dated August 19, 1960, with an option to buy. In April 1967 the petitioners and one Leonard Schmock, the sole shareholders, adopted a plan to liquidate Westshore under section 333.[5] On April 28, 1967, the leasehold interest was consequently assigned to the shareholders. On May 15, 1967, the shareholders exercised the option to purchase the entire tract and on May 19, 1967, made the aforenoted sale of the 1.3 acres.

Petitioners claim that they are entitled to treat their pro rata portion of the gain realized on the sale as long-term within the purview of section 1222.[6] They premise that conclusion on the contention that the exercise of the option resulted in a tax-free exchange of property

---

[4] It is apparently agreed that the property in question qualified for capital asset treatment under sec. 1231 of the Code.

[5] SEC. 333. ELECTION AS TO RECOGNITION OF GAIN IN CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—In the case of property distributed in complete liquidation of a domestic corporation (other than a collapsible corporation to which section 341(a) applies), if—

    (1) the liquidation is made in pursuance of a plan of liquidation adopted on or after June 22, 1954, and

    (2) the distribution is in complete cancellation or redemption of all the stock, and the transfer of all the property under the liquidation occurs within some one calendar month,

then in the case of each qualified electing shareholder (as defined in subsection (c)) gain on the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subsections (e) and (f).

    \*        \*        \*        \*        \*        \*        \*

(e) NONCORPORATE SHAREHOLDERS.—In the case of a qualified electing shareholder other than a corporation—

    (1) there shall be recognized, and treated as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, \* \* \* and

    (2) there shall be recognized, and treated as short-term or long-term capital gain, as the case may be, so much of the remainder of the gain as is not in excess of the amount by which the value of that portion of the assets received by him which consists of money, or of stock or securities acquired by the corporation after December 31, 1953, exceeds his ratable share of such earnings and profits.

[6] SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.

For purposes of this subtitle—

    (1) SHORT-TERM CAPITAL GAIN.—The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income.

    \*        \*        \*        \*        \*        \*

    (3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

of like kind—long-term lease for fee simple title—under section 1031.[7] Thus, they are entitled to carry over their basis in the leasehold (acquired from Westshore under section 333) to their fee simple title. Their basis in the leasehold is determined by reference to their basis in the Westshore stock.[8] Since they are eligible for a carryover basis, the argument runs, they are therefore entitled to tack on to the holding period of the fee the time during which they held the stock of Westshore.[9] This relates their holding period back sufficiently to easily meet the 6-months' requirement of section 1222.

Nonsense, says respondent in effect. Petitioners' holding period for the property commenced on May 15, 1967, when they acquired the fee simple title to the 1.3 acres and the sale 4 days later obviously resulted in short-term capital gain. This position rests on the view that there was no qualifying section 1031 exchange of a leasehold interest for a fee but rather the mere purchase of property through the exercise of an option.

In this instance we think that respondent's analysis is plainly correct.

Preliminarily, we note that property, in the legal sense, means not the thing itself, but rather the rights which inhere in it. Likewise, ownership of property is not a single indivisible concept but rather an aggregate or bundle of rights pertaining to the property involved. *Ted F.*

---

[7] SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

\* \* \* \* \* \* \*

(d) BASIS.—If property was acquired on an exchange described in this section, * * * then the basis shall be the same as that of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized on such exchange.

[8] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(c) PROPERTY RECEIVED IN LIQUIDATION UNDER SECTION 333.—If—

(1) property was acquired by a shareholder in the liquidation of a corporation in cancellation or redemption of stock, and

(2) with respect to such acquisition—

(A) gain was realized, but

(B) as the result of an election made by the shareholder under section 333, the extent to which gain was recognized was determined under section 333,

then the basis shall be the same as the basis of such stock cancelled or redeemed in the liquidation, decreased in the amount of any money received by the shareholder, and increased in the amount of gain recognized to him.

[9] SEC. 1223. HOLDING PERIOD OF PROPERTY.

(1) In determining the period for which the taxpayer has held property received in an exchange, there shall be included the period for which he held the property exchanged if, under this chapter, the property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged, and, in the case of such exchanges after March 1, 1954, the property exchanged at the time of such exchange was a capital asset as defined in section 1221 or property described in section 1231.

*Merrill*, 40 T.C. 66, 74 (1963), affd. 336 F. 2d 771 (C.A. 9, 1964). Also, we observe that the long-term lease involved herein constitutes real property under Wisconsin statutes and Federal income tax law. *Catholic Knights of Wisconsin* v. *Levy*, 261 Wis. 284, 53 N.W. 2d 1 (1952); *Bahcall* v. *Gloss*, 244 Wis. 473, 12 N.W. 2d 674 (1944); sec. 1.1031(a)–1(c), Income Tax Regs. Further, the leasehold, including the option, was used in the trade or business of Westshore, Inc.

With respect to the option clause itself it is fundamental that an option is a contract which gives the optionee the right to buy, sell, lease, or the like within a certain period of time.[10] *James S. Reily*, 53 T.C. 8, 12 (1969). In certain aspects, an option may be deemed "property" in the hands of the option holder. Cf. *John C. Wahl*, 19 T.C. 651, 657 (1953). However, there is a sharp distinction between the character of rights held by an optionee and an owner of an interest in property. *Valleskey* v. *Nelson*, 168 F. Supp. 636 (E.D. Wis. 1958), affd. 271 F. 2d 6 (C.A. 7, 1959); *Louis C. Christensen* v. *Wisconsin Department of Taxation*, 4 Wis. B.T.A. 43 (1949).[11] An option does not ripen into a contract of sale and become a binding obligation on the optioner unless it is accepted by the optionee within the time specified in the agreement. Until the option is exercised it remains a mere right to acquire the property and is not a legal interest therein. See *Megal* v. *Kohlhardt*, 11 Wis. 2d 70, 103 N.W. 2d 892 (1960); *In Re Bisbee's Estate*, 177 Wis. 77, 187 N.W. 653 (1922).

Under section 1031, *supra*, no gain or loss is recognized if property held for productive use in trade or business or for investment is "exchanged" solely for property of a like kind to be held either for productive use in trade or business or for investment. And under section 1223(1), *supra*, where a taxpayer "exchanges" property within the meaning of section 1031, *supra*, and the property received in the exchange has under the Code the same basis in his hands as the basis

---

[10] The general law with respect to the exercise of options is set forth in 91 C.J.S., Vendor & Purchaser, sec. 13, as follows:

"By exercising the option within the stipulated time, the optionee becomes the owner of an equitable interest, which interest becomes vested; or the optionee becomes the equitable owner of the land subject to performance of his contract obligations with the optioner, and the legal title is held by the optioner as trustee for the optionee; * * * [Fns. omitted.]"

The law in Wisconsin is in accord. *Bratt* v. *Peterson*, 31 Wis. 2d 447, 143 N.W. 2d 538 (1966).

[11] In holding that an option is a contract to keep an offer open and is a sale not of property but of the right to purchase, the board stated:

"While one who has an option in writing for the purchase of land has an interest therein (*Wall* v. *The Minneapolis, St. Paul and Sault Ste. Marie R. Co.*, 86 Wis. 48, on page 57), the general rule is that through specific performance the seller cannot compel the buyer to purchase the property. Basically an option is a contract to keep an offer open and is a sale not of property but of a right to purchase. It is a contract by which the owner of property agrees with another that the latter shall have the right to buy the property of the owner at a settled price within a specified time as provided for by the agreement. The difference between options and land contracts is rooted in the test of whether or not the alleged vendor is obligated to sell and the alleged purchaser to buy. *Muirhead* v. *Freimann*, 258 N.W. 238 (Mich.)."

of the property given in the exchange, the period for which the taxpayer has held the original property transferred in the exchange is added to the period for which the taxpayer has held the property received on the exchange.

However, before we need consider the application of section 1223 (1) to the instant case, we must determine whether the exercise of the option on May 15, 1967, caused an "exchange" to take place within the meaning of section 1031, *supra*, as petitioners urge.

We find the conclusion inescapable that petitioners did not obtain legal title to the acreage in question through a section 1031 exchange and that therefore the gain from the sale of the 1.3 acres must be treated as short-term gain under section 1222.

Prior to the section 333 liquidation and immediately thereafter the legal title to the subject of the leasehold was in the lessor, the estate of Luek. On May 15, 1967, upon exercise of the option, the legal title to the whole property vested in petitioners and the leasehold merged in the fee. This is the generally recognized rule. *Badger Oil Co.*, 42 B.T.A. 521, 527 (1940) ; *Wisconsin National Bank*, 4 B.T.A. 109, 112–113 (1926), and authorities cited therein. The rule as to the merger of lesser estates with greater estates is well established. Where the lessee of land becomes the owner thereof in fee simple, the lease is immediately annihilated or, in the phrase of our profession, is said to be merged into the greater.[12] In the instant case, when petitioners acquired legal title to the property in question on May 15, 1967, the leasehold, being a lesser interest, necessarily became merged in the larger interest. *Henry Boos*, 30 B.T.A. 882, 884 (1934).

In *M. Ernest Greenebaum, Jr.*, 27 B.T.A. 889 (1933), the taxpayer leased certain real estate in 1914 for 99 years with an option to purchase the fee title at any time within 20 years for $95,000. The taxpayer exercised the option to purchase the fee title in accordance with the terms of the lease. The taxpayer's associate, acting for himself and the taxpayer, took the fee title and conveyed the same to the purchaser. The Board held that the leasehold estate merged in the fee when the fee title was acquired by the taxpayer and his associate in 1923, and, since the fee was sold and transferred by them within the year of purchase, it did not constitute a capital asset within the meaning of section 206(a) of the 1921 Revenue Act, and the gain derived therefrom was, therefore, taxable as ordinary income. See *D. C. Bothwell*, 27 B.T.A. 1351 (1933).

---

[12] Bouvier says, under the caption "Merger of Estates" :

"When a greater estate and less coincide and meet in one and the same person, without any intermediate estate, the less is immediately merged, that is, sunk or drowned, in the latter; but they must be in one and the same person, at one and the same time, in one and the same right. [Citations omitted.]" Bouvier's Law Dictionary (8th ed.).

"In ordinary usage, an 'exchange' means the giving of one piece of property in return for another." *Jordan Marsh Co.* v. *Commissioner*, 269 F. 2d 453 (C.A. 2, 1959), reversing a Memorandum Opinion of this Court. Within the ambit of *Jordan Marsh*, there can be no question that the petitioners received "property"; namely a fee simple title to the property involved herein on May 15, 1967, when they exercised the option in clause 10 of the lease. Obviously, they did not exchange the balance of the leasehold for said legal title because, as we have noted, that merged with the acquisition of the legal title. In fact, with respect to the leasehold interest, they were dealing with themselves.[13] The petitioners acquired the outstanding larger interest in the property but they made this acquisition without the surrender to any one of any portion of their existing interest. The only consideration moving to the transferor of the title was the $200,000. In short, the obvious reality of the transaction on May 15, 1967, was not an exchange of property interests but a plain and simple purchase and sale of a fee simple title for a cash consideration. "The very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property." *Carlton* v. *United States*, 385 F. 2d 238, 242 (C.A. 5, 1967). See also *Bloomington Coca-Cola Bottling Co.* v. *Commissioner*, 189 F. 2d 14 (C.A. 7, 1951).

Admittedly, the converse is not necessarily true as exemplified in *Century Electric Co.* v. *Commissioner*, 192 F. 2d 155 (C.A. 8, 1951), certiorari denied 342 U.S. 954 (1952), wherein the transaction was held to be an exchange for tax purposes and the sale, which was part of the overall transaction, was disregarded. In *Century Electric Co.* v. *Commissioner*, *supra*, there was an exchange where the taxpayer conveyed a foundry building and the land on which it was situated to a college for a cash sum, and he received back a lease on the building and land from the college. However, in the case at bar, petitioners, on May 15, 1967, exercised the option which vested them with legal title to the fee and then conveyed part of the fee to a stranger to the preceding transactions. Clearly, petitioners did not make an exchange either on May 15, or May 19, 1967. The exercise of the option did much more than make a mere change in the form of ownership; it was a change in the quantum of ownership. Petitioners have cited no authority nor can we find any which would sustain their contention that the fee sold is in fact a continuation of the same property interest which they owned either as stockholders of Westshore, Inc., or as direct owners of the leasehold. No provision exists in the Internal Revenue Code authorizing, in a situation such as this, the tacking on

---

[13] Thus, in this light, it is of no consequence whether or not the leasehold in question may be deemed to have an independent status as an interest in real property under the governing State law or under sec. 1031(a)–1(c), Income Tax Regs., since all interests of whatever nature were assembled and merged in the hands of the petitioners into one complete title to the property.

of holding periods of property subject to an extinguished option. The fact that exercise of the option did not effect any change in possession of the premises, as in *Century Electric Co.*, does not control the situation here. *Jordan Marsh Co.* v. *Commissioner, supra* at 457.

Our analysis of the instant facts is in line with the holding of the Supreme Court in *Helvering* v. *San Joaquin Co.*, 297 U.S. 496 (1936). There, where real property was leased to the taxpayer in 1906 under a lease containing an option to purchase which was exercised in 1916, the Supreme Court held that the property was acquired in 1916, thereby rejecting the taxpayer's contentions that title related back to the date of option and that the exercise of the option constituted merely an exchange of capital assets.

Moreover, we reject petitioners' argument that their economic position was the same before and after the acquisition of legal title to the fee as evidenced within the four corners of the instant case; namely, that the Dane County Probate Court on April 21, 1967, denied the trustee's petition for approval of sale of a part of the leased premises on the ground that a party in interest to the aforesaid lease had not consented to the sale of less than the whole parcel as provided by clause 10 of the lease, but on May 15, 1967 (the date the option was exercised), the court authorized such sale by the petitioners, as owners of the entire fee.

For the first time, on brief, petitioners urge in the alternative that, if respondent's determination is sustained, then they are entitled to a deductible loss in the amount of $16,720 to offset their short-term capital gain, which will result in a refund for the taxable year 1967. The petitioners' claim would raise a substantial new issue; it is not merely a matter of computation. This Court has previously held that it will not consider issues first raised on brief and not appearing in the pleadings. *Sidney Messer*, 52 T.C. 440, 455 (1969), affd. 438 F. 2d 774 (C.A. 3, 1971) ; *Kate Froman Trust*, 58 T.C. 512, 519 (1972).

However, even on the merits petitioners' contention that they sustained a loss on the alleged worthlessness of the lease and subordination agreement when the option was exercised on May 15, 1967, must fail. Upon the liquidation of Westshore, Inc., under section 333, *supra*, the petitioners' basis in their stock became their basis for the 1960 agreement including the option. Sec. 334(c), *supra*. The exercise of the option in no way deprived them of the real estate so that the basis of property distributed to them as shareholders properly became a part of the capital cost to be recovered when the land or a part thereof was sold. *Henry Boos*, 30 B.T.A. 882, 884 (1934). Respondent's determination allowed such partial recovery on the sale to Kenneth E. Alles in the same manner as claimed by petitioners on their returns. *Kalbac* v. *Commissioner*, 298 F. 2d 251 (C.A. 8, 1962), and *J. Gordon Mack*, 3 T.C. 390 (1944), affd. 148 F. 2d 62 (C.A. 3, 1945), certiorari

denied 326 U.S. 719 (1945), cited by the petitioners, do not hold that a deductible loss may arise from the exercise of a purchase option, nor do they stand for the principle that the basis of property may never include the cost or other basis of an exercised option.

*Decisions will be entered under Rule 50.*