## CENTURY ELECTRIC CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 14341.

United States Court of Appeals
Eighth Circuit.

Oct. 31, 1951.

156

Alfred O. Heitzmann, St. Louis, Mo. (Abraham Lowenhaupt, Henry C. Lowenhaupt, William H. Armstrong, and J. Terrell Vaughan, and Lowenhaupt, Waite, Chasnoff & Stolar, and Cobbs, Blake, Armstrong, Teasdale & Roos, all of St. Louis, Mo., on the brief), for petitioner.

Irving I. Axelrad, Special Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., and Ellis N. Slack and Melva M. Graney, Special Assts. to the Atty. Gen., on the brief), for respondent.

Before SANBORN, JOHNSEN and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The peitioner, Century Electric Company, is a corporation engaged principally in the manufacture and sale of electric motors and generators in St. Louis, Missouri. It is not a dealer in real estate. As of December 1, 1943, petitioner transferred a foundry building owned and used by it in its manufacturing business and the land on which the foundry is situated to William Jewell College and claimed a deductible loss on the transaction in its tax return for the calendar year 1943. The Commissioner of Internal Revenue denied the loss. The Commissioner was affirmed by the Tax Court and this petition for review followed.

The opinion of the Tax Court and its findings of fact, stated in great detail, are reported in 15 T.C. 581. Petitioner accepts the Tax Court's findings of fact as correct.

Since its organization in 1901 petitioner has been continuously successful in business. In its income tax return for the year

1943 it reported gross sales of $17,004,839.73 and gross profits from sales of $5,944,386.93. On December 31, 1942, petitioner owned land, buildings, and improvements of the total depreciated cost of $1,902,552.16. On December 31, 1943, its actual cash on hand amounted to $203,123.70. During the year 1943 it distributed cash dividends of $226,705.69 and made a contribution to Washington University of $42,500. It also held tax anticipation notes and Series G bonds totaling $2,000,000, readily convertible into cash and sufficient to liquidate its outstanding 1943 tax liability and its two outstanding 90-day bank notes due January 20, 1944.

Petitioner has always operated its business in large part on borrowed capital. In 1943 it had open lines of credit with the Chase National Bank of New York of $300,000, with the Boatmen's National Bank of St. Louis of the same amount, and with the Mercantile-Commerce Bank and Trust Company of $400,000. At the end of 1943 its outstanding loans from the Mercantile bank amounted to $600,000 approved by the authorized officers of the bank. Petitioner has always been able to liquidate its outstanding 90-day bank loans as they become due either by payment or renewal.

The assessed value of petitioner's foundry building and land upon which it is located for 1943 was $205,780. There was evidence that in St. Louis real property is assessed at its actual value. There was also evidence introduced by petitioner before the Tax Court that the market value for unconditional sale of the foundry building, land, and appurtenances was not in excess of $250,000.

As of December 1, 1943, the adjusted cost basis for the foundry building, land, and appurtenances transferred to William Jewell College was $531,710.97. The building was a specially designed foundry situated in a highly desirable industrial location. It is undisputed in the evidence that the foundry property is necessary to the operation of petitioner's profitable business and that petitioner never at any time considered a sale of the foundry property on terms which would deprive petitioner of its use in its business.

Petitioner's explanation of the transaction with the William Jewell College is that in the spring of 1943 a vice-president of the Mercantile bank where petitioner deposited its money and transacted the most of its banking business suggested to petitioner the advisability of selling some of its real estate holdings for the purpose of improving the ratio of its current assets to current liabilities by the receipt of cash on the sale and the possible realization of a loss deductible for tax purposes. Petitioner's operating business was to be protected by an immediate long-term lease of the real property sold.

Petitioner's board of directors rejected this proposition as unsound. But in July 1943, when a vice-president of the Mercantile bank suggested to petitioner's treasurer that it would be a good idea for petitioner to pay off all its bank loans merely to show that it was able to do so, petitioner interpreted this advice as a call of its bank loans. Acting on this interpretation, petitioner borrowed from the First National Bank in St. Louis on the security of tax anticipation notes held by it, funds with which it discharged all its bank loans. Immediately thereafter it re-established its lines of bank credit and began consideration of a sale of the foundry property and contemporaneous lease from the purchaser.

On September 2, 1943, petitioner's board of directors adopted a resolution that the executive committee of the board study the situation "and present, if possible, a plan covering the sale and rental back by Century Electric Company of the foundry property." The decision to enter into the transaction described was communicated to the Mercantile bank, but petitioner never publicly offered or advertised its foundry property for sale. The Tax Court found that petitioner "was concerned with getting a friendly landlord to lease the property back to it, as there was never any intention on the part of petitioner to discontinue its foundry operations." Several offers to purchase the foundry property at

prices ranging from $110,000 to $150,000 were received and rejected by petitioner.

At a special meeting of the board of directors of petitioner on December 9, 1943, the president of petitioner reported that the officers of petitioner had entered into negotiations for the sale of the foundry property to William Jewell College for the price of $150,000 with the agreement of said college; "that in addition thereto said Trustees of William Jewell College further have agreed to execute a lease of the property so purchased to Century Electric Company for the same time and on substantially the same terms and conditions which were authorized to be accepted by the special meeting of shareholders of this corporation, held on the 24th day of November, 1943." The stockholders at the November meeting had authorized the sale of the foundry property at not less than $150,000 cash, conditioned upon the purchaser executing its lease of the property sold for a term of not less than 25 and not more than 95 years. The Board by resolution approved the proposed transaction with the William Jewell College, but on condition that "this corporation will acquire from Trustees of William Jewell College, a Missouri Corporation, an Indenture of Lease * * * for a term of not less than twenty-five years and for not more than ninety-five years." The resolution set out in detail the terms of the lease from the college to petitioner, approved the form of the deed from the petitioner to the college, authorized the president and secretary of petitioner to execute the lease after its execution by the trustees of the college, and directed "that the president and secretary of this corporation be authorized to deliver said Warranty Deed to said purchaser upon receiving from said purchaser $150,000 in cash, and upon receiving from said purchaser duplicate executed Indenture of Lease on the forms exhibited to this Board." The resolution provided that the deed and lease should be dated December 1, 1943, and effective as of that date.

The deed and the lease were executed and delivered as provided by the resolution of petitioner's board of directors. Neither instrument referred to the other. The deed was in form a general warranty deed, reciting only the consideration of $150,000 in cash. The lease recited among others the respective covenants of the parties as to its term, its termination by either the lessor or lessee, and as to the rents reserved.

As of December 31, 1942, the ratio of petitioner's current assets to its current liabilities was 1.74. The $150,000 in cash received by petitioner on the transaction increased the ratio of current assets to current liabilities from 1.74 to 1.80. The loss deduction which petitioner claims on the transaction and its consequent tax savings would if allowed have increased the ratio approximately twice as much as the receipt of the $150,000.

■■■ The questions presented are:

1. Whether the transaction stated was for tax purposes a sale of the foundry property within the meaning of section 112 of the Internal Revenue Code, 26 U.S.C.A. § 112, on which petitioner realized in 1943 a deductible loss of $381,710.97 determined under section 111 of the code (the adjusted basis of the foundry property of $531,710.97 less $150,000) as petitioner contends; or, as the Tax Court held, an exchange of property held for productive use in a trade or business for property of a like kind to be held for productive use in trade or business in which no gain or loss is recognized under sections 112(b) (1) [1] and 112(e) [2], and

1. "Sec. 112. Recognition of Gain or Loss.
  "(b) Exchanges solely in kind. (1) Property held for productive use or investment. No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment."

2. "(e) Loss from exchanges not solely in kind. If an exchange would be within the provisions of subsection (b) (1) to (5), inclusive, or (10), or within the provisions of subsection (l), of this sec-

Regulation 111, section 29.112(b) (1)-1.[3]

2. Whether if the claimed loss deduction is denied, its amount is deductible as depreciation over the 95-year term of the lease as the Tax Court held, or over the remaining life of the improvements on the foundry as the petitioner contends.

On the first question the Tax Court reached the right result. The answer to the question is not to be found by a resort to the dictionary for the meaning of the words "sales" and "exchanges" in other contexts, but in the purpose and policy of the revenue act as expressed in section 112. Compare Federal Deposit Insurance Corp. v. Tremaine, 2 Cir., 133 F.2d 827, 830; Cabell v. Markham, 2 Cir., 148 F.2d 737, 739; Markham v. Cabell, 326 U.S. 404, 409, 66 S.Ct. 193, 90 L.Ed. 165; Brooklyn National Corp. v. Commissioner, 2 Cir., 157 F. 2d 450, 451; Emery v. Commissioner, 2 Cir., 166 F.2d 27, 30, 1 A.L.R.2d 409. In this section Congress was not defining the words "sales" and "exchanges". It was concerned with the administrative problem involved in the computation of gain or loss in transactions of the character with which the section deals. Subsections 112(b) (1) and 112(e) indicate the controlling policy and purpose of the section, that is, the non-recognition of gain or loss in transactions where neither is readily measured in terms of money, where in theory the taxpayer may have realized gain or loss but where in fact his economic situation is the same after as it was before the transaction. See Fairfield S.S. Corp. v. Commissioner, 2 Cir., 157 F.2d 321, 323; Trenton Cotton Oil Co. v. Commissioner, 6 Cir., 147 F.2d 33, 36. For tax purposes the question is whether the transaction falls within the category just defined. If it does, it is for tax purposes an exchange and not a sale. So much is indicated by subsection 112(b) (1) with regard to the exchange of securities of readily ascertainable market value measured in terms of money. Gain or loss on exchanges of the excepted securities is recognized. Under subsection 112(e) no loss is recognized on an exchange of property held for productive use in trade or business for like property to be held for the same use, although other property or money is also received by the taxpayer. Compare this subsection with subsection 112(c) (1) where in the same circumstances gain is recognized but only to the extent of the other property or money received in the transaction. The comparison clearly indicates that in the computation of gain or loss on a transfer of property held for productive use in trade or business for property of a like kind to be held for the same use, the market value of the properties of like kind involved in the transfer does not enter into the equation.

The transaction here involved may not be separated into its component parts for tax purposes. Tax consequences must depend on what actually was intended and accomplished rather than on the separate steps taken to reach the desired end. The end of the transaction between the petitioner and the college was that intended by the petitioner at its beginning, namely, the transfer of the fee in the foundry property for the 95-year lease on the same property and $150,000.

It is undisputed that the foundry property before the transaction was held

---

tion if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain or loss, but also of other property or money, then no loss from the exchange shall be recognized."

**3.** "Sec. 29.112(b) (1)-1. Property Held for Productive Use in Trade or Business or for Investment.—As used in section 112(b) (1), the words 'like kind' have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not, under such section, be exchanged for property of a different kind or class. The fact that any real estate involved is improved or unimproved is not material, for such fact relates only to the grade or quality of the property and not to its kind or class. * * *

"No gain or loss is recognized if * * * (2) a taxpayer who is not a dealer in real estate exchanges city real estate for a ranch or farm, or a leasehold of a fee with 30 years or more to run for real estate, or improved real estate for unimproved real estate * * *."

by petitioner for productive use in petitioner's business. After the transaction the same property was held by the petitioner for the same use in the same business. Both before and after the transaction the property was necessary to the continued operation of petitioner's business. The only change wrought by the transaction was in the estate or interest of petitioner in the foundry property. In Regulations 111, section 29.112(b) (1)-1, the Treasury has interpreted the words "like kind" as used in subsection 112(b) (1). Under the Treasury interpretation a lease with 30 years or more to run and real estate are properties of "like kind." With the controlling purpose of the applicable section of the revenue code in mind, we can not say that the words "like kind" are so definite and certain that interpretation is neither required nor permitted. The regulation, in force for many years, has survived successive reenactments of the internal revenue acts and has thus acquired the force of law. United States v. Dakota-Montana Oil Co., 288 U.S. 459, 466, 53 S. Ct. 435, 77 L.Ed. 893; Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 116, 59 S.Ct. 423, 83 L.Ed. 536; and see Commissioner of Internal Revenue v. Crichton, 5 Cir., 122 F.2d 181.

On the second question the Tax Court held that petitioner was not entitled to depreciation on the improvements on the foundry property over their useful life after December 1, 1943. The answer to this question depends upon whether as a result of the transaction under consideration the petitioner has an indentifiable capital investment in the improvements on the land covered by the lease. Petitioner contends that the amount of its claimed loss, $381,710.97, should be apportioned between the land and improvements in proportion to their respective cost bases as of November 30, 1943. This would result in an allocation of $277,076.68 of petitioner's investment in the leasehold to the improvements and $104,634.29 to the land. The difficulty with petitioner's position is that it involves assumptions and inferences which find no support in the record. What the petitioner has done is to exchange the

foundry property having an adjusted basis of $531,710.97 on December 1, 1943, for a leasehold and $150,000 in cash. Its capital investment is in the leasehold and not its constituent properties. Accordingly, we agree with the Tax Court that petitioner is entitled to depreciation on the leasehold. The basis for depreciation of the leasehold on December 1, 1943, is, therefore, $381,710.97 under section 113(a) (6) of the revenue code, deductible over the term of the lease.

The decision of the Tax Court is affirmed.