LESLIE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5964-72.    Filed May 19, 1975.

*Floyd V. Amoresano,* for the petitioner.
*Richard Baron* and *Irwin R. Cohen,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| Year | Deficiency |
|---|---|
| 1965 | $176,551.77 |
| 1966 | 50,700.90 |
| 1968 | 155,770.75 |

The issues presented for our determination are (1) whether the sale and leaseback of property by petitioner in 1968 constituted an exchange of property of a like kind within the meaning of section 1031(a)[1] and, if so, (2) whether petitioner should be entitled to depreciate the property under any of the methods specified in section 167(b) and to avail itself of investment credits pursuant to section 38.

The deficiencies in 1965 and 1966 result from the disallowance of net operating loss carrybacks and investment credit carrybacks based on a claimed net operating loss in 1968 and are completely dependent upon our determination of whether the sale and leaseback comes within the purview of section 1031.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are found accordingly.

Petitioner Leslie Co. (hereinafter referred to as Leslie or petitioner) is a New Jersey corporation primarily engaged in the

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

design, manufacture, and industrial distribution of pressure and temperature regulators and automatic instantaneous water heaters. At the time of the filing of its petition with this Court petitioner's principal place of business was located in Parsippany, N.J. For the taxable years 1965 and 1966 corporate income tax returns were filed with the District Director of Internal Revenue, Newark, N.J. The 1968 corporate income tax return was filed with the Internal Revenue Service Center, Philadelphia, Pa.

For many years prior to 1966 Leslie operated its entire business, plant, and office in Lyndhurst, N.J. In 1966 Leslie determined that the Lyndhurst plant would be inadequate for future use and decided to construct a new facility in Parsippany. Upon completion of the new plant the Lyndhurst property was to be sold. Pursuant to the decision to move, Leslie acquired land in Parsippany in March 1967.

On October 30, 1967, after having explored other financing possibilities without success, Leslie agreed to a sale and leaseback of the land with improvements to the Prudential Insurance Co. of America (hereinafter referred to as Prudential). The agreement provided that Prudential would enter into a contract for the purchase and leaseback of the Parsippany property, subject, inter alia, to the following requirements and conditions:

1. The sale price shall not exceed $2,400,000 or the actual cost of land, building and other improvements erected thereon, whichever is the lower. * * *

2. Leslie Co. shall have erected and completed on the above premises a one story, 100% sprinklered, masonry and steel industrial building containing approximately 185,000 square feet * * *. The building is to be constructed and improvements made according to detailed plans and specifications which have been approved by The Prudential. Any changes to the plans * * * must be approved by Prudential prior to commencement of construction.
* * *

4. Prudential will be furnished with the following prior to closing:

(a) A lease with Leslie Co. satisfactory in form and substance to Prudential and Leslie Co. for a term of 30 years at an absolute net rental of $190,560, or 7.94% of purchase price if less than $2,400,000, to be paid monthly, in advance, in equal monthly installments. The lease shall include two (2) renewal options of 10 years each with an absolute net annual rental of $72,000, or 3% of purchase price if less than $2,400,000. The lease shall further include a rejectable offer to purchase at the end of the fifteenth, twentieth, twenty-fifth or thirtieth year based on the following schedule:

|  |  |
|---|---|
| at the end of the 15th year _____ | $1,798,000. |
| at the end of the 20th year _____ | $1,592,000. |
| at the end of the 25th year _____ | $1,386,000. |
| at the end of the 30th year _____ | $1,180,000. |

On December 16, 1968, after completion of the plant as approved by Prudential,[2] Leslie delivered the deed to the Parsippany property to Prudential for $2.4 million. The fair market value of the property at the time of sale was in the neighborhood of $2.4 million. Contemporaneously with the transfer of title to Prudential, Leslie and Prudential entered into the lease as specified in the above agreement. The annual net rental[3] of $190,560 was comparable to the fair rental value of similar types of property in the northern New Jersey area. The lease also provided that all condemnation proceeds, net of any damages suffered by Leslie with respect to its trade fixtures and certain structural improvements, would become the property of Prudential without deduction for the leasehold interest of petitioner.

Leslie's total cost in purchasing the land and constructing the plant was $3.187 million, consisting of the following:

| | |
|---|---|
| Land | $255,000 |
| Building | 2,410,000 |
| Paving and landscaping | 72,000 |
| Boiler (including special features) | 140,000 |
| Special electrical wiring | 138,000 |
| Miscellaneous personal property (including certain special items) | 140,000 |
| Interim finance costs | 20,000 |
| Selling costs | 12,000 |
| Total cost | 3,187,000 |

Leslie would not have entered into the sales part of the transaction without the guarantee of the leaseback.

The Parsippany plant was not in operation on December 16, 1968, the date of closing, and did not become fully operational until mid-January 1969. The useful life of the new plant was stipulated to be 30 years. Leslie sold the Lyndhurst plant for $600,000 when it moved into the Parsippany facilities.

Leslie is not a dealer in real estate.

On its 1968 corporate income tax return Leslie reported the disposition of the Parsippany property as a sale with a gross sale price of $2.4 million and a cost of $3,187,414 with a loss thereon

---

[2] We note that Prudential did not approve the original plans. There was also a misunderstanding on the part of Leslie with respect to the square footage requirements.

[3] The term "net rental," as employed by the parties, indicates that the lessee will pay all taxes, maintenance, and other charges on the property.

of $787,414. The claimed loss resulted in a net operating loss of $366,907, which was carried back to 1965. In addition, an investment credit of $436.41, not utilizable in 1968 on account of the claimed net operating loss, was carried back to 1965. An investment credit of $50,700, likewise not utilizable in 1968 on account of the claimed net operating loss, was carried back to 1966. Respondent, in disallowing the claimed loss, thereby disallowed all of the claimed carrybacks. Respondent would allow the loss as a cost of obtaining the 30-year lease and permit it to be amortized over the period of the lease.

Leslie treated the claimed loss as an unrecovered cost of plant construction on its books to be amortized over 30 years.

Prudential treated the rental receipts as rental income and depreciated the property on its corporate income tax returns.

### OPINION

Respondent, relying upon section 1.1031(a)-1(c), Income Tax Regs.,[4] and *Century Electric Co.,* 15 T.C. 581 (1950), affd. 192 F. 2d 155 (8th Cir. 1951), cert. denied 342 U.S. 954 (1952), submits that the sale and leaseback between petitioner and Prudential falls within the nonrecognition provisions of section 1031,[5] and that, therefore, petitioner's claimed loss is not allow-

---

[4] (c) No gain or loss is recognized if (1) a taxpayer exchanges property held for productive use in his trade or business, together with cash, for other property of like kind for the same use, such as a truck for a new truck or a passenger automobile for a new passenger automobile to be used for a like purpose; or (2) a taxpayer who is not a dealer in real estate exchanges city real estate for a ranch or farm, or exchanges a leasehold of a fee with 30 years or more to run for real estate, or exchanges improved real estate for unimproved real estate; or (3) a taxpayer exchanges investment property and cash for investment property of a like kind.

[5] SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

(b) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a), * * * if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

(c) LOSS FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a), * * * if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain or loss, but also of other property or money, then no loss from the

able. In the same breath, respondent would allow the claimed loss as a "cost" of acquiring the leasehold and amortize it over the 30-year term. Petitioner, on the other hand, submits that there was no "exchange" within the meaning of section 1031, and that, therefore, the claimed loss must be recognized. We agree with petitioner that section 1031 is inapplicable and that the loss must be recognized. The amount is not in dispute.

As an exception to the general rule requiring the recognition of all gains and losses, section 1031 must be strictly construed. See sec. 1002 and the regulations thereunder, particularly sec. 1.1002-1(b), Income Tax Regs.[6] In order for this nonrecognition provision to come into play it must first be established that an exchange occurred. An exchange is defined in the regulations as a transaction involving the reciprocal transfer of property, as distinguished from a transfer of property for a money consideration. Sec. 1.1002-1(d), Income Tax Regs. See also *Vernon Molbreak,* 61 T.C. 382, 390-392 (1973), affd. per curiam 509 F. 2d 616 (7th Cir. 1975).

In the instant situation petitioner executed a sale and lease-back agreement with respect to the Parsippany property. It is clear that the sale and leaseback were merely successive steps of a single integrated transaction. It is also equally clear that petitioner, unable to obtain financing to construct a new plant, employed the sale and leaseback mechanism to obtain the needed new facilities. These factors, however, do not dispose of the issue.

While the leaseback arrangement was a necessary condition to the sale, we are of the opinion that, based on the record before us, the leasehold herein did not have any separate capital value which could be properly viewed as a portion of the consideration paid or exchanged. Petitioner received $2.4 million on the sale of the property. The sale and leaseback agreement, executed prior to

exchange shall be recognized.

[6] (b) *Strict construction of exceptions from general rule.* The exceptions from the general rule requiring the recognition of all gains and losses, like other exceptions from a rule of taxation of general and uniform application, are strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception. Nonrecognition is accorded by the Code only if the exchange is one which satsifies both (1) the specific description in the Code of an excepted exchange, and (2) the underlying purpose for which such exchange is excepted from the general rule. The exchange must be germane to, and a necessary incident of, the investment or enterprise in hand. The relationship of the exchange to the venture or enterprise is always material, and the surrounding facts and circumstances must be shown. As elsewhere, the taxpayer claiming the benefit of the exception must show himself within the exception.

construction of the new facility, provided that the sale price was to be actual cost to petitioner or $2.4 million, whichever was less. This was based on Prudential's appraisal of the worth of the property after improvements. As it turned out, the actual cost to construct the new facilities (including purchase of the land) totaled $3.187 million. Although we are troubled by the disparity between $2.4 million and $3.187 million, the only evidence in the record (and this presented by respondent) indicated that the fair market value of the property as improved at the date of sale was in the neighborhood of $2.4 million, not $3.187 million. Respondent has also not objected to petitioner's proposed finding of fact that the property as improved had a fair market value of $2.4 million at the date of sale.[7] We also note that the evidence presented indicated that this valuation was comparable to the fair market value of similar types of property in the area. The annual net rental was also comparable to the fair rental value of similar types of property in the area. Based on the record before us, we have no choice but to find that the fair market value of the property was within the $2.4 million range. In our judgment, therefore, the sole consideration paid for the property was the $2.4 million in cash. The leasehold, while integral to the transaction, had no separate capital value and was not a part of the consideration. See *City Investing Co.*, 38 T.C. 1, 9 (1962). In support of our finding that the leasehold had no capital value in and of itself at the time of the sale, we also note that in addition to the fact of the sale price and net rentals being for fair value, the condemnation clause in the lease agreement provided (with certain exceptions not material herein) that in the event of condemnation all proceeds would be paid to Prudential without deduction for the leasehold interest. This clause, while clearly not conclusive on the issue, is further evidence of a lack of capital value.

Respondent, however, in the body of his reply brief, argues that since petitioner's cost exceeded the contract price, the difference must be equal to the capital value of the lease. We find this

---

[7] We hypothesize that respondent's willingness to accept petitioner's proposed finding of fair market value was due to his desire to ensure that the transaction would not be characterized as merely financial with title in substance remaining with petitioner. At the same time, relying upon *Century Electric Co.*, 15 T.C. 581 (1950), he must have assumed that this Court would disregard the fair market values in finding sec. 1031 applicable. What he has failed to take into account is that it must first be determined that an "exchange" occurred for sec. 1031 to apply.

unsupported by the evidence presented. In essence, it would appear that respondent is arguing that although the leasehold had no capital value, it had a premium value to petitioner. The excess expenditures over $2.4 million would not be a loss as such to petitioner since it would be able to utilize the improvements as lessee and thus would be willing to spend more than $2.4 million. Although this argument seems to comport to economic realities, it does not give the leasehold value. The difference between $2.4 million and $3.187 million is clearly attributable to the cost of building the plant (including the purchase of land); it is not attributable to the leasehold. While it may be true that it was only because of the leasehold that petitioner was willing to spend $3.187 million, it does not follow that the leasehold had a value equal to the difference between $2.4 million and $3.187 million. To reach such a result, it must be shown that the fair market value of the improved property was $3.187 million, not $2.4 million. This was not done.

From an accounting standpoint it is true that the loss, being an extraordinary item, may cause a distortion of income. That is probably why petitioner amortized the unrecovered costs over the 30-year term in its financial statements. Petitioner's treatment of the item on the books, however, is not dispositive of the issue for tax purposes. It is not at all uncommon to find that the book and tax treatment of a given transaction differ. Although losses may be amortized for book purposes, nothing in the Code permits such amortization for tax purposes.

When all the cards are on the table, the fact remains that petitioner had a cost basis of $3.187 million in the improved property and realized $2.4 million on the sale. The bonafideness of the sale was not questioned by respondent. As stated previously, since the evidence indicates that petitioner would be paying a net rent comparable to the fair rental value, the leasehold could have no value at the time of sale, and thus could not be a part of the consideration paid. It was merely a condition precedent to the sale; no more and no less. The fact that petitioner was willing to sell the property "only with some kind of leaseback arrangement included does not of itself detract from the reality of the sale." Cf. *City Investing Co., supra.*

We, therefore, conclude that there was a bona fide sale of the property and not an "exchange" within the meaning of section 1031. See *Jordan Marsh Co. v. Commissioner,* 269 F.2d 453 (2d

Cir. 1959), nonacq. Rev. Rul. 60-43, 1960-1 C.B. 687, revg. a Memorandum Opinion of this Court. We need not consider *Century Electric Co., supra,* and its possible conflict with *Jordan Marsh Co.* since we have found that there was no "exchange" within the meaning of section 1031. We do note, though, that if an "exchange" had been found, then, assuming "like kind" property, the fair market value of such property would appear not to be relevant.

Since the nonrecognition provisions of section 1031 are not applicable, the general rule of recognition under 1002 applies.

Because of our holding in the above issue we need not consider the other issue presented.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

TANNENWALD, *J.,* dissenting: If I understand the majority opinion correctly, its rationale is (1) the sale and leaseback constituted "integral parts of a single transaction" but this factor is not dispositive of the issue of whether there was an exchange under section 1031, and (2) since the sales price and the lease rental were "for fair value," the lease lacked "capital value" and "the transaction must be classified as a bona fide sale and not as an exchange." I think this rationale is erroneous.

I start from the premise that the record supports a finding that the price Prudential paid for the property was equal to its fair market value and that the lease rental was "fair" (as to which the record, to put it mildly, is sparse). But the fact of the matter is that although the lease in the instant case may not have had a "capital value" in the normal sense of that term, it did have a value beyond the fair rental value to the petitioner herein.

Whatever the respective values of the lease and the fee, it is clear from the record herein that petitioner entered into the transaction with its eyes wide open. It knew at the outset that Prudential would acquire the full benefit (in the form of title to the fee) of all of its expenditures with regard to the property. It committed itself to expend whatever sums it took to construct the building with those improvements required by its own special needs and to pay the legal fees and other costs[1] required to con-

---

[1] The situation with respect to the cost of "miscellaneous personal property" is not clear,

summate the transaction with Prudential. The record herein contains insufficient evidence to support a finding that the petitioner did not contemplate or should not have reasonably contemplated the possibility of a cost overrun; indeed, the record tends to indicate that the opposite was the case.[2] The reason for petitioner's willingness to run the risk of this financial exposure is obvious; in order to operate its business, it needed and was entitled to obtain the lease from Prudential. Thus, the lease had a value *to this petitioner* beyond the rental value, namely, any excess cost that it might incur. In this respect, the situations of the taxpayers in both *Jordan Marsh Co. v. Commissioner,* 269 F. 2d 453 (2d Cir. 1959), revg. T. C. Memo. 1957-237, and *Century Electric Co. v. Commissioner,* 192 F. 2d 155 (8th Cir. 1951), affg. 15 T.C. 581 (1950), are clearly distinguishable. In both those cases, the costs in excess of the fair market value of the fee and/or the fair value of the lease were incurred long before the transaction under scrutiny (in one case, 12 years, and in the other, 13 years). It could not possibly be said that those costs were undertaken in order to consummate the transaction. Here, by way of contrast, petitioner incurred the excess costs for the express purpose of engaging in the transaction with Prudential. Under these circumstances, petitioner, unlike the taxpayer in *Jordan Marsh,* was not "clos[ing] out a losing venture" (see 269 F. 2d at 456), i.e., a venture that did not start out on a predetermined course.

Under my reasoning, it is unnecessary for me to decide the extent to which the decision or rationale of the Second Circuit Court of Appeals in *Jordan Marsh* is in conflict with *Century Electric.* See *City Investing Co.,* 38 T.C. 1, 7 (1962). I have no hesitancy, however, in holding that, even though there was a sale and not an exchange under section 1031,[3] the excess expended by petitioner over the cash received from Prudential, as far as the

---

but it would appear that this included such property erected on or attached to the realty rather than movable property, since the former category was included in the lease while the latter was not.

[2] If the absence of such a contemplated cost overrun were shown to exist, it could be argued that the excess represented a loss rather than a payment for the lease, but I express no opinion as to what my conclusion would be under such circumstances.

[3] In view of the prior commitment by petitioner to sell the property to Prudential, it would seem that, in any event, the requirement of sec. 1031 that the property exchanged be "held for productive use in trade or business * * * (not including * * * property held primarily for sale * * *)" was not satisfied, at least as far as the building was concerned. Cf. *Brooks Griffin,* 49 T.C. 253 (1967).

petitioner is concerned, should be considered as akin to a bonus paid for the lease and amortized over its term. *University Properties, Inc.,* 45 T. C. 416 (1966), affd. 378 F. 2d 83 (9th Cir. 1967), and cases cited therein.[4]

RAUM, DRENNEN, QUEALY, and HALL, *JJ.,* agree with this dissent.

QUEALY, *J.,* dissenting: I must agree with Judge Tannenwald. In this case, the petitioner did not make an unrestricted sale of the property for $2.4 million. The sale was conditional on a leaseback of the property at a rental which was predicated on the sales price, irrespective of value. This was coupled with an option whereby the petitioner might buy back the property at a price which reflected the amortization of the sales price on account of the payment of the rentals. As a part of the consideration, petitioner thus reserved or received a leasehold interest and a favorable option to buy back the property. All things considered, it cannot be said that the petitioner sold the property at a loss.

WILBUR, *J.,* dissenting: The majority opinion founders on an artificial "either-or" dichotomy, and the decision reached suffers from hardening of the categories. The logic proceeds this way: either the transaction must be a sale or exchange; it can't be an exchange as the lease has no capital value; therefore it must be a sale.[1]

This conclusion enables petitioner to immediately write off 25 percent of the costs of acquiring the right to use a building for one-half a century that was constructed for its own special purposes.[2] This does not accord with my understanding of the

---

[4] Neither party addressed itself to the issue whether the transaction herein was a mere financing arrangement. Cf. *Helvering v. F. & R. Lazarus & Co.,* 308 U.S. 252 (1939). Similarly, neither party advanced the contention that petitioner simply acted as Prudential's agent in constructing the building and was simply a conduit for the formal transfer of the property because of its ownership of the land, although it appears that a plausible argument in this vein might have been made.

[1] This is known as the fallacy of the unextended middle. That there was a middle not considered in this case is clearly spelled out in n. 4 of Judge Tannenwald's dissenting opinion. But more importantly, the majority opinion begs the question, ignoring both the form and substance of the transaction, as indicated later in this opinion.

[2] The majority found that the initial agreement provided for the execution of a lease including a rejectable offer to purchase at specified prices after 15, 20, 25, and 30 years. The lease however, did not give Prudential the right to sell the property to Leslie for the specified prices at these intervals, but simply provides that Leslie, at its option, may offer

applicable law.

The expenditure at issue here was clearly incurred for the leasehold interest of 50 years. The majority concedes this by stating that Leslie "would not have entered into the sales part of the transaction without the guarantee of the leaseback;" that the leaseback "was a necessary condition of the sale;" and that "it was only because of the leasehold that petitioner was willing to spend $3.187 million," (thus incurring the loss). This is indeed an ineluctable conclusion, since petitioner constructed the building for Prudential at cost, could not hope to make a profit,[3] but could very well incur a loss in view of the upper limit of $2.4 million on Prudential's investment commitment.

Additionally, petitioner had for several years been planning a new facility, had purchased a site, had plans designed for the facility, and had sought financing from several sources. The arrangement with Prudential brought these goals to fruition; and petitioner's sole motivation for entering into this agreement was to acquire the right to use the building for 50 years. This was the only right Leslie acquired when the first contract with Prudential was signed. The "loss" was purely and simply incurred to acquire the leasehold interest.

The majority ignores the consequences of its own findings by concluding the lease had no capital value.[4] If the thinly supported

to purchase the property for the specified prices at these intervals, and if Prudential rejects the offer, the lease will terminate. Thus, Leslie had the right under the lease to a 50-year term (at a predetermined fixed rent), a term equal to the useful life Prudential claimed for depreciation purposes, and nearly twice the useful life stipulated to by the parties. According to testimony offered by both parties, there was every expectation Leslie would use the building for this period.

[3] Par. 1 of the Oct. 30, 1967, letter agreement states that "the sales price shall not exceed $2,400,000 or the *actual cost* of the land, building, and other improvements erected thereon, *whichever is less.*" (Emphasis added.)

[4] This is a questionable conclusion. The record makes it abundantly clear that Prudential viewed its role as financier rather than landlord, with the opportunity to invest a fixed amount ($2.4 million) recoverable over 30 years with minimal risk to principal. Net "rent" was a percentage of the amount Prudential invested—7.94 percent of $2.4 million for the first 30 years, providing both a fixed interest equivalent and principal amortization. After the first 30 years (when Prudential expected to recover its investment), the "rent" was reduced to 3 percent of the original amount Prudential invested, because in the words of the Prudential official responsible for the transaction, "it was adequate after our initial 30-year period. It covered depreciation and et cetera."

If the "rent" charged pursuant to Prudential's financing objectives bore any relation to the rent an owner of the premises not involved in this type of financing would charge, it was purely coincidental. I seriously doubt the coincidence occurred. Such expert testimony as there is appears directed to the rentals charged for similar space at the time of the lease. In this case the "rent" for valuable real estate in a major metropolitan area could not be increased for one-half a century, and the "rent" for the last 20 years actually decreased to a

findings as to fair market value require the conclusion that a loss was incurred, in view of the above analysis, why must the loss be attributed to the construction of the building (for cost on which no gain was possible) rather than to the acquisition of the leasehold, which was petitioner's only objective? The answer of the majority is two-fold. Since Prudential didn't receive property whose value exceeded the $2.4 million it paid, the leasehold interest must therefore have been worth nothing. Additionally, since the leasehold contemplated fair "rental," it was in fact worth nothing. But this clearly begs the question, since, according to the majority it was petitioner who expended money in excess of the consideration received, and thus incurred the loss here in issue. The question is what was the "loss" attributable to? On this record, the "loss" is clearly attributable to the acquisition of the right to use the property at a fixed rental (diminishing substantially after 30 years) over one-half a century.[5]

The majority also fragments the transaction into component parts that are completely incompatible with its findings that "the sale and leaseback was merely successive steps of a single integrated transaction," and that the leaseback was "an integral part of the transaction." It is also incompatible with recognized principles of tax law. As we stated in *George A. Roesel,* 56 T.C. 14, 25-26 (1971):

the economic substance of a transaction must govern for tax purposes rather than the time sequence or form in which such transaction is cast. *Gregory* v. *Helvering,* 293 U.S. 465. And it is well established that where a series of closely

little more than one-third of the "rent" charged during the first 30 years. Granted it was a net lease, it is still hard to believe that, aside from this package transaction and Prudential's financing role, an owner of real estate in this area would agree to a fixed "rent" for years nearly a half century in the future equal to 3 percent of the property's current value. It may have been adequate to Prudential's financing objectives, but there are real doubts it represented fair rental value over the half-century term of the lease.

[5] For this reason I don't deal with the issue of whether or not the leasehold interest may have had some subjective value to petitioners different from its objective or fair market value. Since under the facts here present the expenditure or "loss" was incurred as an integral part of the agreement to acquire the leasehold, rather than to liquidate a prior investment of considerable duration, this case is clearly distinguishable from *Jordan Marsh Co. v. Commissioner,* 269 F.2d 453 (2d Cir. 1959), nonacq. Rev. Rul. 60-43, 1960-1 C.B. 687, revg. a Memorandum Opinion of this Court. It is also distinguishable because Leslie could not hope, under the terms of its agreement to realize any profit from construction of the building or its transitory ownership of the property. It is, however, puzzling that the majority, after making its findings of fair rental value, specifically rely on *Jordan Marsh Co.* for its conclusion that there was a sale rather than an exchange, yet it claims it is unnecessary to consider the possible conflict between *Jordan Marsh Co.* and *Century Electric Co.,* 15 T.C. 581 (1950), affd. 192 F.2d 155 (8th Cir. 1951), cert. denied 342 U.S. 954 (1952).

related steps are taken pursuant to a plan to achieve an intended result the transaction must be viewed as an integrated whole for tax purposes. *Redwing Carriers, Inc.* v. *Tomlinson,* (C.A. 5) 399 F. 2d 652, and cases cited therein.

This fragmentation is also wholly at odds with the underlying economic realities. In analyzing respondent's argument that the loss was incurred to acquire the leasehold interest, the majority notes that this "seems to comport with the economic realities." Indeed it does, and the general rule, as noted in the above quotation, is that taxation is predicated upon the economic realities.

Prudential clearly looked upon this venture as a financing transaction providing the opportunity to invest $2.4 million at a reasonable interest rate with minimal risks to principal during the period of principal amortization. Petitioner was willing to incur the risk that construction costs would exceed the *maximum* of $2.4 million Prudential agreed to invest, since the risk was more than offset by the right to use the property for 50 years into the future at a fixed annual rental that was not only precluded from increasing, but was reduced substantially at the end of 30 years.[6]

While I believe the economic realities the majority refers to should control, this case does not really require the application of metaphysical concepts like substance over form, or any similar esoteric principles. In both substance and form petitioner contracted at the outset with Prudential for a long-term lease. The contract between the parties contemplated from the beginning—before the first brick was laid—that Prudential would own the land and the building and gave petitioner the right to a half-century of occupancy in return for the agreed rental and the risk of construction cost overruns. Petitioner could not possibly realize a profit on construction and was required[7] to convey title to Prudential as soon as the building was completed. The fact that transitory title was lodged in petitioner briefly along the way does not obscure the inexorable destination of the trip.

In summary, the amount here in controversy was both in substance and in form clearly incurred to acquire the leasehold

---

[6] A substantial but unspecified portion of petitioner's "loss" was attributable to special features presumably for Leslie's particular needs that should have been amortized in any event. Leslie did, in fact, amortize the entire "loss" on its books.

[7] Failure to convey title would have imposed substantial liquidated damages and probably caused petitioner to either default on their construction period loan or pay substantially higher interest rates to obtain alternative financing, or both.

interest, not to make a profit on construction, which was impossible under the terms of the contract involved. The "sale" was merely a "step" in an "integrated transaction," in the majority's own words. We should not view events the parties have telescoped into one package from the reverse end of the telescope.

TANNENWALD and HALL, *JJ.,* agree with this dissent.