CROWLEY, MILNER & COMPANY, A MICHIGAN CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8828–78.     Filed June 17, 1981.

*Joel J. Morris* and *Thomas L. Geer*, for the petitioner.
*Thomas E. Ritter*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in the amount of $159,724.57 and an addition to tax under section 6651(a)[1] in the amount of $919.61 for the tax year ended January 31, 1976. The issues for decision are:

(1) Whether section 1031 applies to a sale-leaseback entered into by petitioner and Prudential Insurance Co. of America;

(2) Whether the loss incurred by petitioner on the transaction should be capitalized as a cost of obtaining the lease and amortized over the term of the lease; and

(3) Whether petitioner is liable for the late filing penalty under section 6651(a).

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

## FINDINGS OF FACT

At the time it filed its petition, petitioner's principal place of business was located in Detroit, Mich. Petitioner filed its return for the taxable year ended January 31, 1976, with the Internal Revenue Service Center, Cincinnati, Ohio, on September 24, 1976. Petitioner reports its income on the accrual method of accounting.

During the period in issue, petitioner operated department stores emphasizing national brand ready-to-wear merchandise. Petitioner's main store was located in Detroit. It also operated eight suburban and satellite outlets.

In the early 1970's, due to the continued deterioration of downtown Detroit's retail environment and the continued unprofitability of petitioner's downtown store, petitioner began to consider closing that store. To maintain revenue and increase profitability, petitioner also began searching for a location for a new store.

At the same time, the Taubman Co., a nationwide developer of major regional shopping centers, proposed to develop three new regional shopping centers for the Detroit area. The Taubman shopping centers typically were large, enclosed malls with one or more anchor stores and a number of smaller specialty shops intended to serve a large geographical area.

The Taubman Co. had devised a "package" plan for developing large regional shopping centers. The Taubman Co. would establish a partnership or a corporation which would purchase land for the shopping center site. This partnership or corporation would, in turn, sell parcels of land to the various so-called anchor or large department store participants in the shopping center project and enter into an operating agreement with these anchor participants whereby the anchor stores would build their stores and the partnership or corporation established by Taubman would build the remainder of the shopping center complex. These major parties to the arrangement would contribute pro rata to the development of the shopping center's common elements, e.g., roadways, parking, lighting, sidewalks, etc.

After investigating the malls planned by Taubman, petitioner decided that the proposed Lakeside Mall (sometimes hereinafter the mall) would meet petitioner's requirements as to timing, demographics, size, complementary anchor department stores, growth potential, and the prestige of being part of a large regional shopping center. In September 1973, petitioner began negotiating with Lakeside Center Associates (Lakeside Associates), the partnership formed to develop and operate the mall,

to include one of petitioner's stores as an anchor store in the proposed mall. At the same time, petitioner entered into negotiations with H. F. Campbell Co. (Campbell), a major Detroit area construction firm, for the design and construction of the contemplated store at the mall.

The "package" developed by Taubman required each anchor participant to purchase the land and build its own store in accordance with the unified shopping center plan. Petitioner, however, was not interested in holding or owning real estate. Instead, petitioner preferred using its limited capital for retail merchandising. With the exception of the original downtown store, all of petitioner's stores were leased rather than owned. Consequently, to comply with Taubman's requirements and to meet its own financial needs, petitioner investigated various forms of financing its Lakeside venture. Petitioner eventually concluded that a sale-leaseback with the Prudential Insurance Co. of America (Prudential) was the most attractive arrangement.

After oral agreements were reached with Lakeside Associates, Campbell, and Prudential, petitioner's board of directors, on March 26, 1974, authorized petitioner to enter into firm written agreements with these parties. The authorization was given in the belief that the negotiation with all three parties would successfully be completed.

After having reached an agreement in principle with Lakeside Associates and with Prudential, petitioner executed the Campbell contract on April 27, 1974. The contract provided that the design of the facility would be developed simultaneously with its construction, and a maximum price of $2,985,072 was set for the landscaping, building exterior, and walls.

On May 2, 1974, petitioner entered into an operating agreement and a supplemental agreement with Lakeside Associates. The agreements provided, among other things, that petitioner would pay Lakeside Associates $28,000 for the land on which the store would be built, and that petitioner would contribute $879,411 towards common area improvements. The agreement further granted mutual easements to the parties for the common areas.

Petitioner continued to negotiate with Prudential during 1974. On November 18, 1974, petitioner entered into an "Agreement of Purchase and Leaseback" with Prudential for the land and

improvements to petitioner's property. The sales price was set at $4 million. Although petitioner originally expected to be able to exclude certain fixtures and improvements from the sale, Prudential insisted that they be included. After unsuccessfully trying to negotiate a higher sales price to cover the costs of the additional inclusions, petitioner eventually acceded to Prudential's demands.

Petitioner and Prudential entered into a 30-year lease with four successive 5-year options to renew. The lease provided for an annual rent of $360,000 plus 1 percent of gross sales exceeding $10 million at the Lakeside Mall store. During the renewal periods, rent was increased by 1 percent of annual gross sales exceeding the average gross sales of the last 2 years of the preceding period.

Petitioner and Prudential closed the sale and leaseback on September 4, 1975. During construction, additional items and changes in existing items covered by the Campbell contract increased the cost of construction to $3,097,150. In addition, petitioner incurred the following costs in completing the building:

| | |
|---|---:|
| Guardian Electric | $43,584.00 |
| Landscaping | 45,100.00 |
| Carpeting | 104,000.00 |
| Painting | 44,400.00 |
| Building permit | 18,499.00 |
| Outside signs | 25,000.00 |
| Giffels Associates | 7,500.00 |
| P.A. system | 9,098.00 |
| Alteration room equipment | 9,260.00 |
| Insurance | 3,240.00 |
| Temporary electric | 3,334.00 |
| Taxes | 4,972.00 |
| Telephone equipment | 1,710.00 |
| Water coolers | 2,072.00 |
| Safe | 1,579.00 |
| Off-site improvements | 879,000.00 |
| Land | 28,000.00 |
| Other costs | 8,958.48 |

The cost to petitioner of the property transferred to Prudential totaled $4,336,456.48, and thus exceeded the $4 million sales price by $336,456.48.

On its books and records, petitioner treated the amount by which its costs exceeded the $4 million sales price as a cost of obtaining the Lakeside Mall leaseback and amortized the cost over 30 years. On its income tax return for the taxable year ended January 31, 1976, petitioner claimed a loss of $336,456.48 on the sale of the property. Respondent disallowed the claimed loss on the grounds that the sale-leaseback constituted a like-kind exchange within the meaning of section 1031. Respondent determined that the expenses in excess of the sales price should be amortized over the term of the lease.

Petitioner filed its return for its taxable year ended January 31, 1976, on September 24, 1976, claiming an overpayment of $159,302.89. Petitioner had timely filed a request for an automatic extension until July 15, 1976. Prior to July 15, 1976, petitioner applied for an additional extension of time in which to file. This application was denied on July 22, 1976. Both extension requests were accompanied by payments of $365,000.

## OPINION

Section 165(a) provides that a corporation may deduct any "loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 1002[2] sets forth the general rule that the entire amount of the gain or loss realized upon the sale or exchange of property, except as otherwise provided, shall be recognized.

An exception to the general rule is established by section 1031.[3] That section provides for the nonrecognition of gain or

---

[2]Sec. 1002 was repealed by Pub. L. 94–455, 90 Stat. 1520, for the tax years beginning after 1976. The provision was incorporated into sec. 1001(c).

[3]SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVEST-MENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

(b) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

loss when property held for use in a trade or business or investment is exchanged for like-kind property which is to be held for use in the trade or business or investment. If cash or other property which does not qualify as like-kind property is included in the exchange, gain (but not loss) is recognized to the extent of the cash or other property received.

Respondent contends that petitioner transferred the land and building to Prudential in a like-kind exchange for a 30-year renewable lease and cash.[4] Consequently, respondent reasons, under section 1031 petitioner is not entitled to currently deduct the loss realized upon the sale. Rather, respondent contends that the loss should be amortized over the term of the lease as a cost incurred to obtain the lease.

Petitioner, to the contrary, maintains that the property was transferred to Prudential in a sale rather than a like-kind exchange. Petitioner concludes, therefore, that the loss is deductible in the year of the transfer.

The threshold issue to be decided is whether the transaction constituted a sale or an exchange. If a sale occurred, then the provisions of section 1031 do not apply. If, on the other hand, an exchange took place, then we would have to decide whether the exchange was made for like-kind property as required by section 1031.

The applicable income tax regulations define an exchange as "a reciprocal transfer of property, as distinguished from a transfer of property for a money consideration only." Sec. 1.1002–1(d), Income Tax Regs. The regulations further state that nonrecognition will be accorded only if the exchange meets both the definition and "the underlying purpose for which such exchange is excepted from the general rule." Sec. 1.1002–1(b), Income Tax Regs. Thus, in order to determine whether the transfer was a sale or an exchange, we must determine whether the transfer was for cash only or whether the lease had capital value so that it was part of the consideration for the transfer of the property. See *Leslie Co. v. Commissioner*, 539 F.2d 943, 949

---

[4]Respondent relies on *Century Electric Co. v. Commissioner*, 192 F.2d 155 (8th Cir. 1951), affg. 15 T.C. 581 (1950), cert. denied 342 U.S. 954 (1952), and sec. 1.1031(a)–1(c), Income Tax Regs., to support his determination that the real property and 30-year lease constituted like-kind property. Those regulations state in pertinent part:

(c) No gain or loss is recognized if * * * (2) a taxpayer who is not a dealer in real estate * * * exchanges a leasehold of a fee with 30 years or more to run for real estate * * *

(3d Cir. 1976), affg. 64 T.C. 247 (1975); *Jordan Marsh Co. v. Commissioner*, 269 F.2d 453, 455 (2d Cir. 1959), revg. a Memorandum Opinion of this Court on another point. Cf. *Century Electric Co. v. Commissioner*, 192 F.2d 155 (8th Cir. 1951), affg. 15 T.C. 581 (1950), cert. denied 342 U.S. 954 (1952) (where the lease had capital value). The lease had capital value if the $4 million sales price was less than the property's fair market value, or if the rent to be paid was less than the fair rental rate. See *Leslie Co. v. Commissioner*, 539 F.2d at 949.

In *Leslie Co. v. Commissioner, supra,* this Court faced a set of facts involving construction financed by Prudential on terms virtually identical to the facts presently before us. In that case, we found, in the light of all the evidence, that the lease entered into by the taxpayer had no capital value and that the sale-leaseback, therefore, constituted a transfer for cash only rather than a like-kind exchange accompanied by "boot." Accordingly, we allowed petitioner to deduct the loss realized upon the sale in the year of the sale. We reach the same conclusion here.

Respondent attempts to distinguish *Leslie* on the grounds that, in the case before us, the lease entered into by petitioner had capital value. Respondent contends that the $4 million price received by petitioner was less than the fair market value of the property, and that therefore the capital value of the leaseback equaled the amount by which the property's fair market value exceeded the sales price. As evidence to support his argument that the leasehold had a capital value, respondent points to petitioner's great interest in the property's unique features.

Considerable testimony has been introduced with regard to the fair market value and fair rental of the transferred property. We think it clear that the sale and lease were negotiated in an arm's-length dealing. We are convinced by the expert testimony introduced by petitioner that the actual sales price of the building and the agreed rent were at fair market values.

The lease for the 115,300-square-foot building calls for rental at an annual rate of $360,000 or about $3.12 per square foot, plus 1 percent of annual sales over $10 million. Petitioner's expert compared this rate with the average net rental of $2.48 per square foot paid for K-Mart stores in southeastern Michigan during 1974 and 1975. Because of the superior quality of the Lakeside Mall store, he used the K-Mart rent to set a lower limit

on the fair market rental of the Lakeside store. He also consulted an authoritative publication on shopping center rents of 550 centers throughout the United States for comparison purposes. In the light of this information, he concluded that the lease called for a fair rent, not a bargain rate.

Petitioner's expert used an income approach to derive the building's value. He determined that a fair rate of return for the property would be between 9 and 9½ percent. Capitalizing the rent paid by petitioner at that percentage, petitioner's expert concluded that the building had a value of $4 million.[5] We agree with petitioner that actual construction costs do not necessarily measure fair market value, and that, here, the fair market value of the store was $4 million notwithstanding construction costs exceeding that figure by approximately $340,000.

We recognize that the lease was desirable to petitioner due to the mall's unique features detailed in our findings of fact. Nevertheless, this does not mean, as respondent apparently contends, that the lease had greater value than the rent to be paid and thus had capital value. The factors that appealed to petitioner were considered in determining whether the negotiated rent provided by the lease was at fair market value. Thus, the fact that petitioner was interested in the lease was reflected by the fair market rental paid by petitioner. We note that the lease provided that Prudential was to receive the entire proceeds in the event of condemnation. Furthermore, the lease did not grant petitioner any greater control over the property than that generally held by a tenant. Therefore, the leasehold itself had no capital value. See *Leslie Co. v. Commissioner*, 539 F.2d at 949.

The transaction also fails to meet the underlying purpose for which section 1031 excepts exchanges from the general rules. Sec. 1.1002–1(b), Income Tax Regs. One of the primary purposes for allowing the deferral of gain in a like-kind exchange is to avoid imposing a tax upon a taxpayer who, while changing his form of ownership, is continuing the nature of his investment. H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 564. *Jordan Marsh Co. v. Commissioner*, 269 F.2d at 455; *Biggs v. Commissioner*, 69 T.C. 905, 913 (1978), affd. 632 F.2d 1171 (5th

---

[5]Petitioner's expert noted that if he had used a capitalization rate of 10 percent, the value of the building would have been around $3,600,000 and the disputed loss would have been greater.

Cir. 1980). In *Koch v. Commissioner*, 71 T.C. 54, 63–64 (1978), we explained:

The basic reason for allowing nonrecognition of gain or loss on the exchange of like-kind property is that the taxpayer's economic situation after the exchange is fundamentally the same as it was before the transaction occurred. "[I]f the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested, he is not allowed to compute and deduct his theoretical loss on the exchange, nor is he charged with a tax upon his theoretical profit." * * * The rules of section 1031 apply automatically; they are not elective. * * * The underlying assumption of section 1031(a) is that the new property is substantially a continuation of the old investment still unliquidated. * * * [Citations omitted.]

We do not think that an exchange of like-kind property occurred here. Petitioner's money did not continue to be "tied up" in like-kind property. Rather, consistent with its longstanding policy, petitioner cashed in its investment in the property because it preferred to use its limited working capital in its merchandising endeavors rather than to buy "bricks and mortar."

We have found that the lease had no capital value. Consequently, petitioner did not swap its real property for Prudential's interest in a long-term lease, but instead received, as the sole consideration for the transfer of the property, cash in the amount of the property's fair market value. Thus, under the regulations, the transaction qualifies as a sale rather than a like-kind exchange.

It is true that petitioner would not have sold the property to Prudential without obtaining the leaseback. Nevertheless, the parties bargained at arm's length to arrive at a fair market sales price and rent. Furthermore, petitioner retained no rights other than those typically held by a lessee. See *City Investing Co. v. Commissioner*, 38 T.C. 1, 9 (1962). Therefore, the fact that petitioner was willing to sell the property in question "only with some kind of leaseback arrangement included does not of itself detract from the reality of the sale." *Leslie Co. v. Commissioner*, 64 T.C. at 254; *City Investing Co. v. Commissioner*, *supra* at 9. Accordingly, the transfer was a sale, not an exchange under

section 1031, and petitioner is entitled to a deduction for the loss on the sale in the tax year ended January 31, 1976.[6]

Respondent also contends that the excess cost of the property over the cash received should be capitalized as a cost of obtaining the leasehold and amortized over the term of the lease. Respondent maintains that the excess expenses were in reality a payment for the premium value of the leasehold. We have already rejected respondent's contention that the lease had capital value. Therefore, the excess expenses were not a form of payment for any supposed premium value. To the contrary, the record indicates that petitioner incurred the excess expenses to ensure the completion of the sale and the return of its invested capital. Petitioner originally expected to be able to exclude certain fixtures and improvements from the sale. Because of hard bargaining by Prudential, however, petitioner finally agreed to transfer those items at no increase in the sales price, resulting in the excess costs. Accordingly, the excess expenses were not incurred to obtain the leasehold and are not required to be amortized over the term of the lease.[7]

Section 6651(a)[8] provides for a late filing penalty on the amount of tax required to be shown as due on the return. Although petitioner's return was filed after the extended deadline of July 15, 1976, petitioner had paid more than the ultimate tax owed prior to the lapse of the extension. Consequently, no tax was due upon the filing of petitioner's return, and hence petitioner is not liable for the late filing penalty.

To reflect the foregoing,

*Decision will be entered for the petitioner.*

---

[6]Because of our holding, we do not need to consider whether the real property and the 30-year lease constituted like-kind property.

[7]We recognize that petitioner amortized the loss over the lease term in its financial books. Nevertheless, book and tax treatments of transactions often differ. See *Leslie Co. v. Commissioner*, 64 T.C. 247, 254 (1975). Thus, this by itself does not mean that the excess expenses should be amortized for tax purposes.

[8]SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX.

(a) ADDITION TO THE TAX.—In case of failure—

(1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax

---

on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.