## LESLIE CO.

### v.

## COMMISSIONER OF INTERNAL REVENUE, Appellant.

### No. 75–2305.

United States Court of Appeals, Third Circuit.

Argued May 3, 1976.

Decided July 9, 1976.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Elmer J. Kelsey, Francis J. Gould, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Evans, Hand, Allabough & Amoresano, Paterson, N. J., for appellee; James F. McNaboe and Thomas F. Craig, II, Paterson, N. J., on the brief; Floyd V. Amoresano, Paterson, N. J., of counsel.

Before ALDISERT, GIBBONS, and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal involves the tax consequences of a sale and leaseback arrangement. The question presented is whether the sale and leaseback arrangement constitutes an exchange of like-kind properties, on which no loss is recognized, or whether that transaction is governed by the general recognition provision of Int.Rev.Code § 1002.[1] The Tax Court, on taxpayer's petition for a redetermination of deficiencies assessed against it by the Commissioner, held that the fee conveyance aspect of the transaction was a sale entitled to recognition, and that the leaseback was merely a condition precedent to that sale. The Tax Court thereby allowed the loss claimed by the taxpayer. For the reasons given below, we affirm.

### I.

Leslie Company, the taxpayer, is a New Jersey corporation engaged in the manufacture and distribution of pressure and temperature regulators and instantaneous water heaters. Leslie, finding its Lyndhurst, New Jersey plant inadequate for its needs, decided to move to a new facility. To this end, in March 1967 Leslie purchased land in Parsippany, on which to construct a new manufacturing plant.

Leslie, however, was unable to acquire the necessary financing for the construction of its proposed $2,400,000 plant. Accordingly, on October 30, 1967, it entered into an agreement with the Prudential Life Insurance Company of America, whereby Leslie would erect a plant to specifications approved by Prudential and Prudential would then purchase the Parsippany property and building from Leslie. At the time of purchase Prudential would lease back the facility to Leslie. The property and improvements were to be conveyed to Prudential for $2,400,000 or the actual cost to Leslie, whichever amount was less.

The lease term was established at 30 years,[2] at an annual net rental of $190,560, which was 7.94% of the purchase price. The lease agreement gave Leslie two 10-year options to renew. The annual net rental during each option period was $72,000, or 3% of the purchase price. The lease also provided that Leslie could offer to repurchase the property[3] at five-year intervals, beginning with the 15th year of the lease, at specified prices as follows:

| at the end of the | | |
|---|---|---|
| (15th year | $1,798,000 | |
| (20th year | 1,592,000 | |
| (25th year | 1,386,000 | |
| (30th year | 1,180,000 | |

---

1. All references are to the Internal Revenue Code of 1954.

2. The parties stipulated, and the Tax Court found accordingly, that the useful life of the building Leslie constructed was 30 years.

3. *See* note 10 *infra*.

Under the lease Prudential was entitled to all condemnation proceeds, net of any damages suffered by Leslie with respect to its trade fixtures and certain structural improvements, without any deduction for Leslie's leasehold interest.

Construction was completed in December, 1968, at a total cost to Leslie (including the purchase price of the land) of $3,187,414. On December 16, 1968 Leslie unconditionally conveyed the property to Prudential, as its contract required, for $2,400,000. At the same time, Leslie and Prudential executed a 30-year lease.

Leslie, on its 1968 corporate income tax return, reported and deducted a loss of $787,414 from the sale of the property.[4] The Commissioner of Internal Revenue disallowed the claimed loss on the ground that the sale and leaseback transaction constituted an exchange of like-kind properties within the scope of Int.Rev.Code § 1031. That section of the Code, if applicable, provides for nonrecognition (and hence nondeductibility) of such losses.[5] Rather than permitting Leslie to take the entire deduction of $787,414 in 1968, the Commissioner

treated the $787,414 as Leslie's cost in obtaining the lease, and amortized that sum over the lease's 30-year term. Accordingly, Leslie was assessed deficiencies of $383,- 023.52 in its corporate income taxes for the years 1965, 1966 and 1968.

Leslie petitioned the Tax Court for a redetermination of the deficiencies assessed against it, contending that the conveyance of the Parsippany property constituted a sale, on which loss is recognized.[6] The Tax Court agreed.[7]

Although the Tax Court found as a fact that Leslie would not have entered into the sale transaction without a leaseback guarantee, 64 T.C. at 250, it concluded that this finding was not dispositive of the character of the transaction. Rather, it held that to constitute an exchange under Int.Rev.Code § 1031 there must be a reciprocal transfer of properties, as distinguished from a transfer of property for a money consideration only. 64 T.C. at 252, *citing* Treas.Reg. § 1.1002–1(d). Based on its findings that the fair market value of the Parsippany property at the time of sale was "in the neighborhood of" the $2,400,000 which Pru-

---

**4.** The $787,414 was the difference between Leslie's actual cost of $3,187,414 and the $2,400,- 000 which Prudential paid Leslie for the property. This 1968 loss resulted in a net operating loss for that year of $366,907, which was carried back to 1965, and the carryback of an investment credit of $436.41 to 1965 and of $50,700 to 1966.

**5.** Int.Rev.Code § 1031 is an exception to the general rule of recognition of gains and losses on the sale or exchange of property. It provides:

(a) Nonrecognition of gain or loss from exchanges solely in kind.

—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade *or other property* held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

Int.Rev.Code § 1031(a). .

If an exchange would be within this provision but for the fact that money is received in addition to property, no loss is recognized. Int. Rev.Code § 1031(c). According to the regulations promulgated pursuant to this section, an exchange of a fee for a leasehold interest with 30 or more years to run is a like-kind exchange. Treas.Reg. § 1.1031(a)–1(c).

The Commissioner characterizes the instant transaction as an exchange of real property for a 30-year lease plus cash ($2,400,000.) (Appellant's Brief at 2). Thus, in the Commissioner's view, Int.Rev.Code § 1031(c) applies.

**6.** Leslie amended its petition before trial to argue, in the alternative, that the transaction, if not a sale, should be viewed as a mortgage financing arrangement, thereby entitling Leslie to capitalize the property and avail itself of depreciation deductions and the investment tax credit. The Tax Court did not reach this issue because of its holding that the transaction was a sale. Similarly, our disposition makes it unnecessary for us to consider this alternative argument.

**7.** 64 T.C. 247 (1975).

dential paid, and that the annual net rental of $190,560 to be paid by Leslie was comparable to the fair rental value of similar types of property in the Northern New Jersey area,[8] the Tax Court majority reasoned that Leslie's leasehold had no separate capital value which could be properly viewed as part of the consideration paid. Accordingly, Leslie having received $2,400,000 from Prudential as the sole consideration for the property conveyed, the Tax Court held that the transaction was not an exchange of like-kind properties within the purview of Int.Rev.Code § 1031, but was rather a sale, and so governed by the general recognition provision of Int.Rev.Code § 1002.[9]

Six judges of the Tax Court dissented from this holding. Judge Tannenwald, in an opinion in which Judges Raum, Drennen, Quealy and Hall joined, agreed with the Tax Court majority that the conveyance was a sale, but would have disallowed a loss deduction, reasoning that the leasehold had a premium value to Leslie equal to the $787,414 difference between cost and sales price.[10] This dissent reasoned that since Leslie would not have willingly incurred the loss but for the guaranteed lease, this amount should be treated as a bonus paid for the leasehold, and should be amortized over the leasehold's 30-year term.

Judge Wilbur, in a separate dissent with which Judges Tannenwald and Hall agreed, 64 T.C. at 257, declined to decide whether the conveyance was a sale or an exchange.

His concern was that the Tax Court majority was permitting the taxpayer to "write off 25 per cent of the costs of acquiring the right to use a building for one-half a century that was constructed for its [Leslie's] own special purposes." He, like Judge Tannenwald, would hold that the loss incurred was attributable to the acquisition of the leasehold interest rather than to the construction of the building.

The Commissioner's appeal from the decision of the Tax Court followed.

### II.

The threshold question in any dispute involving the applicability of Int.Rev.Code § 1031 is whether the transaction constitutes an exchange. This is so because § 1031 nonrecognition applies only to exchanges. Section 1031 does not apply where, for example, a taxpayer sells business property for cash and immediately reinvests that cash in other business property even if that property is "like-kind" property. *Bell Lines, Inc. v. United States,* 480 F.2d 710 (4th Cir. 1973). Hence, our inquiry must center on whether the Leslie-Prudential transaction was a sale, as Leslie contends, or an exchange, as the Commissioner argues. If a sale, then, as stated, § 1031 is inapplicable and we need not be concerned further with ascertaining whether the other requirements of that section have been met. *See Jordan Marsh Co. v. Commissioner,* 269 F.2d 453, 455 (2d Cir. 1959). If an ex-

---

**8.** These findings were based on the testimony of a witness presented by the Commissioner, who testified that the sale price of the property and the rental established by the lease were comparable to their respective fair market values. This testimony, as might be expected, was uncontroverted by the taxpayer.

**9.** Int.Rev.Code § 1002 provides, in pertinent part:

Except as otherwise provided . . ., on the sale or exchange of property the entire amount of the gain or loss . . . shall be recognized.

**10.** 64 T.C. at 255. Judge Quealy also filed a separate dissent, 64 T.C. at 257, in which he pointed to Leslie's reservation of a favorable option to repurchase the property as further

support for the position that the petitioner incurred no loss upon sale.

We are hard pressed to agree with this characterization of Leslie's very limited rights of repurchase under the lease as "favorable." The repurchase right is set forth in Article XXIV of the lease, entitled "Option to Purchase." Leslie is given the right to terminate the lease after the 15th, 20th, 25th and 30th years. To do so, however, it must make an offer to repurchase the property back from Prudential, at specified prices. *See* page 3, *supra.* Prudential need not accept the offer, although nonacceptance does not prejudice Leslie's rights of termination. Thus Leslie's option to offer to repurchase may be exercised only at the risk of losing the right to use the property for the remainder of the lease term.

change, then of course we would be obliged to continue our inquiry to determine if the properties involved were "like-kind."

The Tax Court's conclusion that the Leslie conveyance resulted in a sale was predicated almost totally on an analysis of the applicable Treasury Regulations. Noting that Treas.Reg. § 1.1002–1(b) requires a strict construction of § 1031,[11] the Tax Court tested the instant transaction against the definition of "exchange" contained in Treas.Reg. § 1.1002(d):

> (d) Exchange. Ordinarily, to constitute an exchange, the transaction must be a reciprocal transfer of property as distinguished from a transfer of property for a money consideration only.

Based on its conclusion that the leasehold had no capital value, the Tax Court held that it was not a part of the consideration received but was merely a condition precedent to the sale. Thus, the conveyance to Prudential was "solely for a money consideration" and therefore was not an "exchange." The Tax Court cited *Jordan Marsh Co. v. Commissioner, supra,* in support of its result. In light of its holding, it specifically declined to consider or resolve any possible conflict between *Jordan Marsh,* a decision of the Second Circuit, and the Eighth Circuit decision in *Century Electric Co. v. Commissioner,* 192 F.2d 155 (8th Cir.

1951), *cert. denied,* 342 U.S. 954, 72 S.Ct. 625, 96 L.Ed. 708 (1952).

The Commissioner, relying on *Century Electric,* argues that the Tax Court erred in holding the Leslie-Prudential conveyance to be a sale. He could not, and does not, dispute the Tax Court's findings as to the fair market value and fair rental value of the property. Rather, he argues that value in this context is irrelevant and that the only appropriate consideration is whether the conveyance of the fee and the conveyance of the leasehold were reciprocal.[12] The Commissioner, without regard to his own regulations which define an "exchange," then seeks to support his position by reference to the legislative purpose giving rise to the enactment of the nonrecognition provision. He argues that this provision (§ 1031 and its predecessors) was adopted primarily to eliminate any requirement that the government value the property, involved in such exchanges.[13] Alternatively, the Commissioner argues that even if the conveyance is held to be a sale and thereby not within Int.Rev.Code § 1031, any expenditure incurred by Leslie over and above the selling price of $2,400,000 was not a loss as claimed, but rather a premium or bonus which Leslie paid to obtain the leasehold. Such an expenditure is a capital expenditure, the Commissioner argues, and

---

11. Treas.Reg. § 1.1002–1(b) provides in pertinent part:

> (b) Strict Construction of Exceptions From General Rule. The exceptions from the general rule requiring the recognition of all gains and losses, like other exceptions from a rule of taxation of general and uniform application, are strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception. Nonrecognition is accorded by the Code only if the exchange is one which satisfies both (1) the specific description in the Code of an excepted exchange, and (2) the underlying purpose for which such exchange is excepted from the general rule. . . .

12. As noted above, the Tax Court found that this element of reciprocity *was* present.

13. The Commissioner takes the position that: The statute was intended to be corrective legislation of three specific shortcomings of prior Revenue Acts, viz—(1) the administrative burden of valuing property received in a

like-kind exchange; (2) the inequity, in the case of an exchange, of forcing a taxpayer to recognize a paper gain which was still tied up in a continuing investment; and (3) the prevention of taxpayer from taking colorable losses in wash sales and other fictitious exchanges. Preliminary Report of a Subcommittee of the House Committee on Ways and Means on Prevention of Tax Avoidance, 73d Cong., 2d Sess. (1933), pp. 37–42. See H.Rep.No.350, 67th Cong., 1st Sess. (1921), p. 10 (1939–1 Cum.Bull. (Part 2) 168, 175–176); H.Rep.No.704, 73d Cong., 2d Sess. (1934), pp. 12–13 (1939–1 Cum.Bull. (Part 2) 554, 563–564). The construction of Section 1031 in *Jordan Marsh [see* discussion *infra* p. 948] satisfies only one of these Congressional objectives. And, further, it has the effect of frustrating the Congressional objective of removing the administrative burden of valuating property in like-kind exchanges.
Appellant's Brief at 11.

therefore should be amortized over the 30-year lease term.

Leslie, on the other hand, urges affirmance of the Tax Court's holding, relying on *Jordan Marsh Co. v. Commissioner, supra,* and stresses, as does the Tax Court, that the initial issue to be resolved is the character of the transaction. Alternatively Leslie argues that, if the conveyance is held to be a like-kind exchange within Int.Rev.Code § 1031, Leslie, even though it is not the owner of the fee, should nonetheless be permitted to depreciate the property on an accelerated (double declining) basis and to avail itself of investment tax credits.[14]

In *Century Electric Co. v. Commissioner, supra,* the Eighth Circuit held a sale and leaseback arrangement to be a like-kind exchange governed by the nonrecognition provision of § 112 (the predecessor to § 1031). Its holding that no loss was to be recognized was based solely on its finding that the sale and leaseback transactions were reciprocal. The Eighth Circuit read the legislative history of § 112 as evidencing a Congressional purpose to relieve the government of the administrative burden of valuing properties received in like-kind exchanges. Thus the Court stated (192 F.2d at 159) that:

> the market value of the properties of like kind involved in the transfer does not enter into the equation.

By contrast, in *Jordan Marsh v. Commissioner, supra,* a case construing the same code provision as *Century Electric,* the Second Circuit held that a similar sale and leaseback transaction resulted in a *sale,* on which loss was recognized. The facts in *Jordan Marsh* were similar to the facts here. Jordan Marsh, the taxpayer, had sold two parcels of land for cash in the sum of $2.3 million, an amount which was stipulated to be equal to the fair market value of the property. Simultaneously, the premises were leased back to Jordan Marsh for a term of 30-plus years, with options to renew. The rentals to be paid by Jordan Marsh were "full and normal rentals", so that the Court found that the leasehold interest had no separate capital value.

The Court, in examining the legislative history of § 112, took issue with the Eighth Circuit's interpretation of the Congressional purpose behind the nonrecognition provision. The Second Circuit said that:

> Congress was primarily concerned with the inequity, in the case of an exchange, of forcing a taxpayer to recognize a paper gain which was still tied up in a continuing investment of the same sort.

269 F.2d at 456. It reasoned further that, if gains were not to be recognized on the ground that they were theoretical, then neither should losses, which were equally theoretical, be recognized. Analyzing the Jordan Marsh transaction in the light of this interpretation of Congressional purpose, the Second Circuit, finding Jordan Marsh had liquidated its investment in realty for cash in an amount fully equal to the value of the fee, concluded that the taxpayer was not "still tied up in a continuing investment of the same sort." Accordingly, the Court held that there was no exchange within the purview of § 112(b), but rather a sale.

Thus we may interpret the essential difference between *Jordan Marsh* and *Century Electric* as centering on their respective views of the need to value property involved in a sale and leaseback.[15] *Jordan*

---

14. As might be anticipated, the Commissioner would disallow both the depreciation and the investment tax credit on the ground that the leasehold, unlike a fee, is an intangible interest in property.

Leslie concedes in its brief that accelerated depreciation may be taken only with respect to tangible property, but argues that if the sale and leaseback transaction is held to be a like-kind exchange then the leasehold property received in exchange for the concededly "tangi-

ble" fee interest, must also be viewed as "tangible."

The Commissioner filed a reply brief in which he argued that Leslie's failure to file a cross-appeal precluded it from raising this issue. Because we do not reach Leslie's alternative argument, we need not decide whether it was properly raised.

15. The Court in *Jordan Marsh* also distinguished *Century Electric* on its facts, since in that case there had been no finding that the cash received by the taxpayer was the full

*Marsh,* viewing the Congressional purpose behind the non-recognition provision as one of avoiding taxation of paper gains and losses, would value the properties involved in order to determine whether the requirements of an "exchange" have been met. *Century Electric,* on the other hand, viewing the legislative enactment as one to relieve the administrative burden of valuation, would regard the value of the properties involved as irrelevant.

We are persuaded that the *Jordan Marsh* approach is a more satisfactory one. First, it is supported by the Commissioner's own definition of "exchange" which distinguishes an exchange from a transfer of property *solely* for a money consideration. Treas.Reg. § 1.1002–1(d) (emphasis added).[16] Second, if resort is to be had to legislative history, it appears to us that the view of Congressional purpose taken by the *Jordan Marsh* court is sounder than that of the Eighth Circuit in *Century.* As the Court in *Jordan Marsh* said in discounting the purpose attributed to Congress by the Commissioner and by *Century Electric*:

> Indeed, if these sections had been intended to obviate the necessity of making difficult valuations, one would have expected them to provide for nonrecognition of gains and losses in all exchanges, whether the property received in exchanges were 'of a like kind' or *not* of a like kind. And if such had been the legislative objective, § 112(c) providing for the recognition of gain from exchanges not wholly in kind, would never have been enacted. (Footnote omitted).

It seems to us, therefore, that in order to determine whether money was the sole consideration for a transfer the fair market value of the properties involved must be ascertained. Here, the Tax Court found that Leslie had sold its property uncondi-

tionally for cash equal to its fair market value, and had acquired a leasehold for which it was obligated to pay fair rental value. These findings, not clearly erroneous, are binding on this Court. *See* Int.Rev. Code § 7482; *Thornton v. United States,* 493 F.2d 164, 166 (3d Cir. 1974).

Nor do we think the Tax Court erred in concluding that the leasehold acquired by Leslie had no capital value. Among other considerations, the rental charged at fair market rates, the lack of compensation for the leasehold interest in the event of condemnation, and the absence of any substantial right of control over the property all support this conclusion. On this record, we agree with the Tax Court that the conveyance was not an exchange, "a reciprocal transfer of property," but was rather "a transfer of property for a money consideration only," and therefore a *sale, see* Treas. Reg. § 1.1002–1(d), governed by the general recognition provision of Int.Rev.Code § 1002.

The Commissioner's evidence that the rentals charged to Leslie under its lease were at fair market value, leading to our conclusion that the leasehold had no capital value, also disposes of the Commissioner's alternative argument on appeal that Leslie's excess cost of $787,414 was not a loss. *See* Int.Rev.Code §§ 1002, 1001.

The decision of the Tax Court will be affirmed.

---

equivalent of the value of the fee which had been conveyed. Nor had there been a finding that the leaseback was at a rental which was a fair rental for the premises.

Indeed, as noted in *Jordan Marsh,* the record in *Century Electric* indicated that the sales price was substantially less than the fair market value. There was also evidence from

which the Court could have found that the leasehold had a separate capital value, since the conveyance to a nonprofit college avoided considerable tax liabilities on the property.

**16.** It was this definition on which the Tax Court relied in large part in holding the Leslie conveyance to be a sale for $2,400,000.