FREDERICK W. BEHRENS AND ETHEL BEHRENS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Behrens v. Commissioner
Docket No. 20583-82.
United States Tax Court
T.C. Memo 1985-195; 1985 Tax Ct. Memo LEXIS 436; 49 T.C.M. (CCH) 1284; T.C.M. (RIA) 85195; April 23, 1985. Robert J. Murray, for the petitioners. Robert L. Archambault, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in the amount of $11,363.70 in petitioners' 1978 Federal income tax. After concessions by petitioners, [1] the sole issue for decision is whether petitioners must recognize gain in the amount of $22,080.37 on a transaction in which they traded in four *438 old truck tractors for four new truck tractors. Resolution of this issue depends on whether the $22,080.37 in cash that petitioners received in the transaction constitutes "other property or money" (boot) within the meaning of section 1031(b). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The written and oral stipulations of facts and the exhibits attached to the written stipulation are incorporated *439 herein by this reference. Petitioners, husband and wife, resided in Omaha, Nebraska, at the time they filed their petition in this case. Petitioners filed their 1978 joint Federal individual income tax return (Form 1040) with the Internal Revenue Service Center in Ogden, Utah. Petitioner Ethel Behrens is a party to this case solely because she filed a joint return with petitioner Frederick W. Behrens for the taxable year 1978. References to petitioner in the singular are to petitioner Frederick W. Behrens. During the taxable year 1978 and for several years prior thereto, petitioner was a star route mail contractor for the U.S. Postal Service. He operated a trucking business that hauled mail for the Postal Service and also hauled other commodities for other customers. In his trucking business petitioner owned and operated four trucks to perform scheduled hauling for the Postal Service. In order to adhere to his hauling schedule, petitioner also maintained a spare truck for use in the event that one of the other trucks broke down. On June 30, 1978, petitioner contracted with International Harvester Company (IHC) to trade in three 1974 and one 1975 International Harvester *440 truck tractors (the old tractors) that petitioner had been using in his trucking business for four new 1978 International Harvester truck tractors (the new tractors). To effect the transaction, petitioner and IHC entered into two contracts, both dated and executed on June 30, 1978. In the first contract (the sales contract) petitioner agreed to sell the old tractors to IHC. In the second contract (the purchase contract) petitioner agreed to buy the new tractors from IHC. The sales contract provided that IHC agreed to pay petitioner an aggregate purchase price of $64,000 for the old tractors. [3] The old tractors were encumbered by an unsatisfied debt (the old debt) petitioner owed International Harvester Credit Corporation[4] in the amount of $26,119.63. As consideration for the old tractors, IHC cancelled the old debt and issued petitioner a check in the amount of $37,880.37. That check represented petitioner's net equity in the old tractors (the difference between the $64,000 aggregate purchase price for the old tractors and the old debt of $26,119.63). [5]
*441 The purchase contract provided that petitioner agreed to pay IHC the aggregate purchase price of $158,000 [6] for the new tractors. On June 30, 1978, pursuant to the purchase contract, petitioner issued a check in the amount of $15,800 as a down payment on the purchase price of the new tractors. Under the purchase contract, petitioner obligated himself to pay the balance of the purchase price ($142,200) (the new debt), together with interest thereon, over a five-year period commencing on August 12, 1978. Petitioner paid the $15,800 down payment out of the $37,880.37 he received for his net equity in the old tractors. Petitioner retained the balance of the money he received for the old tractors ($22,080.37) and used it as working capital in his trucking business.[7] Petitioner did not report any gain from the exchange transaction on his 1978 Federal tax return. *442 Petitioner has financed the acquisition of the vehicles used in his trucking business through International Harvester for as long as he has operated the business, which, at the time of the trial, was approximately 30 years. International Harvester considered petitioner a good credit risk. In his notice of deficiency dated June 22, 1982, respondent determined that petitioner should have recognized gain from the exchange transaction to the extent of $22,080.37, [8] the amount of money petitioner received in the transaction and used as working capital rather than as part of the purchase price of the new tractors. OPINION At the outset, we note that the parties agree that *443 although cast in the form of two separate contracts pursuant to which petitioner sold the old tractors to IHC and purchased the new tractors from IHC, the transaction in issue constituted an exchange subject to the provisions of section 1031. See Rev. Rul. 61-119, 1961-1 C.B. 395. We have accepted the parties' characterization of the transaction. [9]
The general rule lof section 1001(c) is that any gain or loss on the sale or exchange of property shall be recognized. Section 1031(a) provides an exception to the general rule. Under section 1031(a), no gain or loss shall be recognized if property held for productive use in a trade or business or for investment is exchanged solely for property of a like kind to be held either for productive use in a trade or business or for investment. If money or other property not of a like kind (boot) is also received in the exchange, gain is recognized, but only to the *444 extent of the boot received. Sec. 1031(b). Section 1031, like all exceptions to the general recognition rule of section 1001(c), is to be strictly construed, and does not extend beyond the words or the underlying assumptions and purposes of the exception. Sec. 1.1002-1(b), Income Tax Regs.; [10]Leslie Co. v. Commissioner,64 T.C. 247, 252 (1975), affd. 539 F. 2d 943 (3d Cir. 1976); Black v. Commissioner,35 T.C. 90, 94 (1960). The purpose of section 1031 is to defer the recognition of gain or loss on transactions in which, although in theory the taxpayer may have realized a gain or loss, his economic situation is in substance the same after the transaction as it was before the transaction. Stated another way, if the taxpayer's money continues to be invested in the same kind of property, gain or loss should not be recognized. H. Rept. No. 704, 73d Cong., 2d Sess. (1934), 1939-1 C.B. (Part 2) 554, 564; Jordan Marsh Co. v. Commissioner,269 F. 2d 453, 455-456 (2d Cir. 1959), revg. a Memorandum Opinion of this Court; Biggs v. Commissioner,69 T.C. 905, 913 (1978), affd. 632 F. 2d 1171 (5th Cir. 1980). *445 The underlying assumption of section 1031 is that the new property is substantially a continuation of the old investment still unliquidated. Commissioner v. P.G. Lake, Inc.,356 U.S. 260, 268 (1958); Koch v. Commissioner,71 T.C. 54, 64 (1978). *446 The like-kind exchange in this case involved four old truck tractors traded to International Harvester for four new truck tractors (the like-kind property). Petitioner's net equity in the old tractors was $37,880.37 (fair market value of $64,000 less indebtedness of $26,119.63). He used $15,800 of that net equity as the down payment on the new tractors, and used the balance of his net equity ($22,080.37) for operating capital in his trucking business. That $22,080.37 is sometimes referred to in this opinion as "the net credit," a term coined by petitioner in his briefs. [11]
The issue before us is whether the $22,080.37 in cash petitioner received (the net credit), which he did not apply towards the purchase price of the new tractors but retained and used as working capital in his trucking business, constitutes boot under section 1031(b) so as to trigger recognition *447 of the gain to that extent. Petitioner argues that the net credit is not boot but the proceeds of an indirect loan made by International Harvester to petitioner at the time of the exchange transaction. Thus, according to petitioner, section 1031(a) and not section 1031(b) applies. Moreover, because section 1031(a) provides for nonrecognition of the gain on a like-kind exchange and because loan proceeds are not income, petitioner reasons that he need not recognize any of the gain from the exchange transaction. Respondent, on the other hand, contends that the $22,080.37 does not represent loan proceeds, but a liquidation of a portion of petitioner's net equity in his truck tractors, and is therefore boot under section 1031(b). Thus, respondent continues, petitioner must recognize gain on the exchange transaction under section 1031(b) to the extent of the $22,080.37 cash received. We agree with respondent. In arguing that the $22,080.37 was a loan from International Harvester, petitioner relies heavily on the fact that the amount of the new debt he incurred in the exchange ($142,200) was greater than what it would have been if he had applied that amount against the purchase price *448 of the new tractors as part of his down payment. Petitioner asserts that "[t]he record in this case clearly illustrates that the net credit in question was intended by both parties to the transaction as an extension of credit from the seller in conjunction with the disposition [sic] of the four new tractors." There is no evidence in the record as to International Harvester's intention. We think petitioner misinterprets the evidence of record. The evidence shows that, pursuant to the sales contract, IHC paid petitioner cash for his entire net equity of $37,880.37 in the old tractors. Then, pursuant to the purchase contract, petitioner used $15,800 of that money as a cash down payment on the $158,000 aggregate purchase price of the new tractors, and financed the balance thereof ($142,200) through IHC. Petitioner retained the balance of the $37,880.37 (the $22,080.37--the so-called net credit) and used it as working capital in his trucking business. There is no evidence to suggest that the amount financed by International Harvester bore any direct relationship or was determined with direct reference to the amount of the net credit. The only relationship between the $142,200 *449 amount financed and the $22,080.37 net credit is the obvious fact that if petitioner had made a larger down payment and had used the entire $37,880.37 as his down payment, he would have had a smaller balance to finance. See nn. 6, 7, supra. In response to the Court's direct question, petitioner testified that the $158,000 stated purchase price for the new tractors was not inflated for nor did it otherwise reflect International Harvester's payment of the net credit to petitioner. In other words, the fair market value of the new tractors was $158,000, and the $142,200 amount financed represented only the balance owed on the tractors, not the balance owed on the tractors plus an unstated loan of $22,080.37. Also the $64,000 price for the old tractors represented their fair market value and had not been inflated to include an unstated loan of $22,080.37. There is simply no evidence of any loan from International Harvester other than the loan for the balance of the purchase price of the new tractors. Obviously, if petitioner had used any part of the net credit or any other funds as an additional down payment on the new tractors, the financed portion of the aggregate purchase *450 price would necessarily have been decreased. That, however, does not indicate that the net credit was an extension of credit from International Harvester to petitioner. We think that the evidence of record vividly demonstrates that the net credit was not a loan but a partial liquidation of petitioner's net equity in his truck tractors. As noted above, the theory underlying the nonrecognition of the gain in a like-kind exchange under section 1031(a) is that the new property (here, the new tractors) is substantially a continuation of the old investment (petitioner's net equity in the old tractors) stillunliquidated.Commissioner v. P.G. Lake, Inc.,supra,356 U.S. at 268; Koch v. Commissioner,supra,71 T.C. at 64. Where, as here, a portion of the old investment is liquidated and not continued in the new property (by petitioner's receipt of his net equity in the old tractors in cash and his failure to use all of such net equity as a down payment on the new tractors), section 1031(b) requires recognition of the gain to that extent. Simply stated, petitioner's net equity in the old tractors before the exchange was $37,880.37; his net *451 equity in the new tractors after the exchange was $15,800. Petitioner received cash of $22,080.37 which was not continued as part of his investment in the tractors but instead was used for operating capital in his business. This $22,080.37 would seem to be one of the clearest examples of boot under section 1031(b). Nonetheless, petitioner argues vigorously against that result.Petitioner seeks to draw support for his position from a number of cases. He cites 124 Front Street, Inc. v. Commissioner,65 T.C. 6 (1975), for the proposition that a participant in a section 1031 exchange may also act as another party's financier in connection with the transaction. We agree. In fact, International Harvester did just that here. However, separate from and in addition to financing petitioner's acquisition of the new tractors, International Harvester also paid petitioner cash for a portion of his net equity in the old tractors. That was not the case in 124 Front Street, Inc.,supra.There, the taxpayer owned an option to acquire property that Firemen's Insurance desired to obtain. Firemen's advanced $425,000 to the taxpayer so that it could acquire *452 the desired property and then transfer it to Firemen's in exchange for other property. We held that the money advanced to the taxpayer was not boot but a loan because the money was to be used by the taxpayer to purchase the desired property and if it could not be so used, the money was to be returned to Firemen's. The taxpayer used the $425,000 to purchase the option property that was transferred to Firemen's in exchange for other property. Unlike petitioner, the taxpayer in 124 Front Street, Inc. did not retain any part of the $425,000 for his own use and the cash did not reduce the taxpayer's net investment in the like-kind properties exchanged. Here, the cash petitioner received did reduce his net investment in the truck tractors. In a similar vein, petitioner directs our attention to Commissioner v. North Shore Bus Co., Inc.,143 F. 2d 114 (2d Cir. 1944), affg. a Memorandum Opinion of this Court. The taxpayer there traded in ten old buses to a manufacturer for ten new buses. The old buses had an agreed upon value of $30,000 and were encumbered by a debt of approximately $24,000. As part of the exchange manufacturer was to discharge the pre-existing debt *453 and credit the taxpayer's net equity of $6,000 (the old buses' value of $30,000 less the old debt of approximately $24,000) against the purchase price of the new buses, the balance of which the taxpayer was to pay in installments. The manufacturer issued its check for $24,000 to the taxpayer, which then used it to pay the old debt. The Second Circuit held that neither the taxpayer's role as a conduit (through which the funds used to discharge the old debt passed) nor the manufacturer's providing such funds required the taxpayer to recognize any gain on the transaction. With respect to the manufacturer's providing the $24,000 used to discharge the debt, the Court of Appeals stated "[t]hat phase of the transaction increased the secured debt which [the taxpayer] owed [the manufacturer] by the amount of the check, and at most enabled it to exchange creditors when it discharged the old mortgage." Commissioner v. North Shore Bus Co., Inc.,supra,143 F. 2d at 115. Petitioner seizes upon the quoted language and argues that "[t]he resulting increase of a secured debt in North Shore Bus Co. is precisely the same result as that obtained in this case * * *. *454 " We disagree. That $24,000 would be analogous in this case only to the old debt of $26,119.63 on the old tractors that IHC discharged. What we are concerned with here is the net equity in the old tractors (the $37,880.37) which is analogous to the $6,000 net equity in North Shore Bus Co. Although petitioner could have reduced the new debt by using all of his net equity in the old tractors as a down payment on the aggregate purchase price of the new tractors, he did not do so and there was no "increase" in the new debt to cover the net credit. The aggregate purchase price for the new tractors was $158,000; petitioner paid $15,800 down, leaving the new debt of $142,200 to be financed. The calculation of the amount financed by International Harvester was not dependent upon the amount of the net credit. Thus, the quoted language from North Shore Bus Co. is inapposite. More importantly, the facts of North Shore Bus Co. are completely distinguishable from those before us. The most important distinction is that the taxpayer in North Shore Bus Co. maintained its pre-exchange net equity of $6,000 in its buses after the exchange and had no more cash after the transaction *455 than before. After the exchange petitioner had reduced his equity in his investment from $37,880.37 to $15,800 and had $22,080.37 in cash. Petitioner also cites our decision in Biggs v. Commissioner,supra, as supporting his characterization of the net credit as the nontaxable proceeds of an indirect loan rather than as taxable boot. The taxpayer in Biggs advanced funds for and assisted in intermediary in the acquisition of property he was to receive in an exchange transaction. At the closing of the transaction the taxpayer received the acquired property, cash, and a promissory note in exchange for property he had owned for quite some time. We held that a portion of the cash and the note equal to the cash advances the taxpayer had made represented repayment of those advances and therefore did not constitute boot within the meaning of section 1031(b). Biggs v. Commissioner,supra,69 T.C. at 916-917. Our holding in Biggs does not aid petitioner because he is arguing that the net credit he received represented loan proceeds, not loan repayments. Petitioner contends that cash received in a like-kind exchange does not always *456 constitute boot and therefore trigger recognition of gain under section 1031(b). He further asserts that "[i]t is only when cash is used to equalize the values of the respective properties that are being traded that it becomes boot." (Emphasis in Pet. Brief.) In support of this proposition, petitioner cites Barker v. Commissioner,74 T.C. 555 (1980). That case involved a "four corner" section 1031 exchange in which the taxpayer transferred her property to and received other property from an intermediary. Both properties were subject to mortgages, the mortgage on the property the taxpayer transferred being less than the mortgage on the property she received. Simultaneously with the exchange, the mortgage encumbering the taxpayer's property was discharged with funds provided by the ultimate acquirer of the taxpayer's property. The Barker case addressed the basic principle that cash consideration received in a like-kind exchange cannot be offset by the liabilities assumed. The "boot netting" rules discussed and applied in that case had their antecedents in Coleman v. Commissioner,180 F. 2d 758 (8th Cir. 1950), affg. a Memorandum Opinion *457 of this Court. We think the facts in the case before us are quite analogous to those present in Coleman v. Commissioner,supra. There, the taxpayer orally agreed to exchange his farm for a second farm and to pay the other party $21,000 in cash, but only if he received the second farm free and clear. The second farm was encumbered by a $35,000 mortgage on which the mortgagee would not allow prepayment.After realizing they could not consummate their oral agreement, the parties contracted in writing to exchange their respective farms, that the taxpayer would assume the $35,000 mortgage encumbering the second farm, and that the other party would pay the taxpayer $14,000 in cash, which he could use as he pleased. The Eighth Circuit held that under the predecessor of section 1031(b) the taxpayer had to recognize the gain he had realized on the transaction to the extent of the $14,000 cash he received. In so holding the Court of Appeals relied on the fact that the taxpayer was not a conduit whereby the $14,000 was conveyed to the mortgagee in payment of the mortgage and that the taxpayer was not obligated to apply the $14,000 to the mortgage debt. Thus, the Court *458 did not permit the netting of cash boot received by the taxpayer against boot he gave by assuming a mortgage liability. Respondent subsequently incorporated that rule into the regulations. See sec. 1.1031(d)-2, Example (2)(c), Income Tax Regs. [12]
*459 In Barker v. Commissioner,supra, after discussing the "boot netting" rules of sections 1.1031(b)-1(c) and 1.1031(d)-2 Examples (1) and (2), Income Tax Regs., this Court held that the taxpayer was not required to recognize and gain on the exchange due to the discharge of the mortgage on the property she transferred because she was contractually bound to use the cash to satisfy the mortgage and was therefore little more than a conduit for the payment of the mortgage by the transferee. We observed that: While a taxpayer who receives boot by surrendering mortgaged property can offset the boot by any boot given, including cash, a taxpayer who receives consideration in the form of cash to compensate for a difference in net values in the properties (fair market value less mortgage) cannot offset the cash boot by boot given by virtue of receiving mortgaged property. * * * Thus, a taxpayer who receives cash consideration to compensate for a difference in net values must recognize gain realized to the extent of the sum of cash received and the net difference in favor of himself between the mortgage on the property transferred and the mortgage *460 on the property received. * * * 74 T.C. at 569. (Emphasis supplied in part, citations and fn. ref. omitted.) Petitioner points to these statements as supporting his contention that only when cash is used to equalize the values of the exchanged properties does it constitute boot. A close reading of the quoted passages indicates that we were not describing the only circumstances in which cash constitutes boot. More importantly, it confirms our holding here. We said that when a taxpayer who receives cash to compensate for "a difference in net values in the properties (fair market value less mortgage) [i.e., what we have been referring to as net equity]" must recognize gain realized to the extent of the sum of cash received. 74 T.C. at 569. We spoke in terms of a difference in net values or net equity in the properties exchanged, not an overall change in the taxpayer's total net worth, as petitioner argues. Petitioner received cash in the exchange that represented the difference between his net equity in the old tractors and his net equity in the new tractors. Thus, although the analogy is far from perfect due to the vastly differing *461 facts, the quoted language from and the reasoning of our Barker decision support our holding that petitioner must recognize gain under section 1031(b). As was so aptly noted in Barker,supra, at 74 T.C. 570: A taxpayer is not allowed to offset cash received by boot given in a case where the taxpayer has received two distinct assets--like-kind property (albeit mortgaged) and cash--and the taxpayer has an unfettered right to do with the cash as he pleases. Coleman v. Commissioner,180 F. 2d 758 (8th Cir. 1950).In that type of case, the taxpayer can exit the transaction with non-like-kind property--the cash. It seems appropriate to trigger the recognition of gain in those circumstances. Petitioner contends that the no-netting rule of Coleman,supra, and section 1.1031(d)-2, Example (2)(c) should not apply to him because he did not assume a pre-existing liability, but incurred a newly created debt in connection with his exchange transaction. The regulations speak only in terms of assuming a liability, not of assuming a pre-existing liability. See n. 12, supra.Petitioner cites and we *462 have found no authority permitting the netting of cash received against consideration given by taking property subject to a liability based on the liability being newly created rather than pre-existing. Petitioner also seems to argue that because the new debt was newly created the $22,080.37 cash should be treated as a loan and not as boot. Petitioner has not suggested and we cannot think of any reason why that should be the case. If the boot provision of section 1031(b) and the limited boot-netting permitted under the regulations could be circumvented by the simple device of creating new debt rather than continuing old debt, then cash consideration would never be boot. If that were the case, any taxpayer could cash-out portions of his equity in any exchange transaction without triggering recognition of any gain. We do not think that is the rule under the statute, regulations, or case law. Finally, petitioner observes that he could have achieved the same economic results as the actual exchange transaction without adverse tax consequences. He could have borrowed $22,080.37 (the amount of the net credit) from a third-party lender before or after the trade-in, encumbering his truck *463 tractors and reducing his net equity therein to $15,800. Under that scenario, petitioner would have received a check from IHC for $37,880.37, the difference between the fair market value of the old tractors ($64,000) and the amount of debt encumbering the old tractors owed to IHC ($26,119.63), and applied the full amount thereof as a down payment on the new tractors. The amount of petitioner's indebtedness to IHC would have been $120,119.63 ($158,000 aggregate purchase price for the new tractors less $37,880.37 down payment), but the total amount of debt encumbering the new tractors after the third-party loan would still have been $142,200 (debt to IHC of $120,119.63 plus debt to a third-party lender of $22,080.37). The proceeds of the third-party loan (whether made before or after the trade-in) would not have been income subject to tax. See Commissioner v. Tufts,461 U.S. 300, 307 (1983). The boot petitioner would have received due to IHC's taking the old tractors subject to the old debt would have been netted out by the boot petitioner gave by taking the new tractors subject to the new debt. Secs. 1.1031(b)-1(c) and 1.1031(d)-2 Examples (1) and (2 *464 ), Income Tax Regs. Because petitioner would not have received any "other property or money" in the exchange, it would have qualified for nonrecognition treatment under section 1031(a). [13] Thus, petitioner suggests that he should not be taxed on the transaction as it was actually cast because he could have arranged the same results without being taxed. We disagree. First, we must point out that the tax consequences of a transaction are governed by what was actually done rather than by what might have been done. Commissioner v. Nat. Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 149 (1974); Coleman v. Commissioner,supra,180 F. 2d at 760. Accord, Weiss v. Stearn,265 U.S. 242, 254 (1924); Rogers v. Commissioner,44 T.C. 126, 136 (1965), affd. per curiam 377 F. 2d 534 (9th Cir. 1967). *465 More importantly, petitioner apparently fails to realize that the distinguishing factor between his two hypothetical alternatives and what actually took place is the particular transaction in which the $22,080.37 cash is received. If petitioner had borrowed the money from a third-party lender, he would have received the cash in a nontaxable event: the borrowing of money. But petitioner actually obtained the $22,080.37 through an exchange of property. Such a transaction usually triggers the recognition of gain, sec. 1001(c), but may not if the requirements of section 1031(a) are met. One of those requirements is that property be exchanged solely for property of like kind. This "solely" requirement precludes nonrecognition of gain under section 1031(a) where the taxpayer exits the exchange with money resulting from a liguidation of part of his net equity in the property exchanged, which petitioner did. Thus, the fact that petitioner could have reduced his net equity in his truck tractors before of after the trade-in through a nontaxable loan (and thereby avoided any adverse tax consequences therefrom) neither conflicts with nor derogates from our holding. It simply did not *466 happen. Petitioner's liquidation of a part of his net equity in his truck tractors through the exchange places the transaction under section 1031(b) and petitioner's gain must be recognized to the extent of the $22,080.37. [14]
To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Petitioners have conceded the following adjustments: (1) An insurance expense deduction in the amount of $267; (2) An interest expense deduction in the amount of $337.92; and (3) The recapture of previously claimed investment credit in the amount of $3,354.17. Other adjustments derive directly from the sole issue before the Court and include increases in petitioners' depreciation deduction and investment credit. Petitioners do not contest respondent's use of income averaging in his calculation of the deficiency. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The $64,000 figure represented the fair market value of the old tractors, i.e. that petitioner's three used 1974 truck tractors were worth a total of $45,000 and that his used 1975 truck tractor was worth $19,000. ↩
4. Apparently, International Harvester Credit Corporation (IHCC) is a financing corporation related to IHC. The parties have treated IHC and IHCC as one party to the trade-in for purposes of their respective legal analyses of the transaction; so shall we. Hereafter, we shall refer only to IHC or International Harvester. ↩
5. As of June 30, 1978, petitioner's aggregate adjusted basis in the old tractors was $34,115.18, calculated as follows: ↩
Original basis
$79,927.90 Depreciationallowed
(45,812.72)
Adjusted basis
$34,115.18 6. The stated purchase price of $158,000 for the new tractors was the actual purchase price (i.e. fair market value) and was not inflated for nor did it otherwise reflect the payment of $22,080.37 to petitioner (the portion of his equity in his old tractors that he ultimately retained).↩
7. Petitioner's testimony at one point suggested that the balance of the purchase price ($142,200) somehow included the $22,080.37. See n. 6, supra.↩ That is true only in the sense that he owed more (the $142,200) than he would have owed if he had used the entire net equity of the old tractors (the $37,880.37) as a down payment on the new tractors.
8. We note that petitioner realized a gain of $29,884.82 on the exchange transaction, determined as follows: Value of new tractors
$158,000.00
Cash received
37,880.37
Old debt
26,119.63
Total consideration received
$222,000.00 Adjusted basis of old tractors
34,115.18
Cash paid
15,800.00
New debt
142,200.00
Total consideration given
(192,115.18)
Gain realized
$29,884.82 See secs. 1001(a), 1001(b); sec. 1.1031(d)-2, Example (2↩), Income Tax Regs.
9. Accordingly, we express no opinion as to whether we would have treated the two transactions as an exchange within section 1031. Had such issue been raised, we would have scrutinized more closely the role of IHCC in this matter. See n. 4, supra.↩
10. Section 1.1002-1, Income Tax Regs., was promulgated under section 1002, which has been repealed; at the same time section 1002 was repealed, substantially identical language was added to section 1001(c). See secs. 1901(b)(28)(B)(1) and 1901(a)(121) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1799, 1784, 1976-3 (Vol. 1) C.B. 1, 275, 260, effective for taxable years beginning after December 31, 1976. In T.D. 7665, 1980-1 C.B. 319, respondent removed various regulation sections, including section 1.1002, Income Tax Regs. The Treasury Decision was effective January 25, 1980, and intended no substantive changes in the regulations. Although respondent has not yet placed the substantive provisions of section 1.1002-1, Income Tax Regs., into a regulation under section 1001(c), he has taken the position that it is applicable to section 1001(c). See Rev. Rul. 81-63, 1981-1 C.B. 455, 456. Section 1.1002-1, Income Tax Regs., is therefore applicable to the 1978 taxable year before the Court. See Magneson v. Commissioner,81 T.C. 767, 769-770, n. 2 (1983), affd. 753 F. 2d 1490↩ (9th Cir. 1985).
11. The Court uses the term solely for convenience in considering petitioner's arguments, but attaches no legal significance to it. The term may tend to obfuscate the facts since it may suggest merely a bookkeeping entry whereas the $22,080.37 was actual dollars in petitioner's pocket that he spent in his business.↩
12. Section 1.1031(b)-1(c), Income Tax Regs., provides as follows: (c) Consideration received in the form of an assumption of liabilities (or a transfer subject to a liability) is to be treated as "other property or money" for the purposes of section 1031(b). Where, on an exchange described in section 1031(b), each party to the exchange either assumes a liability of the other party or acquires property subject to a liability, then, in determining the amount of "other property or money" for purposes of section 1031(b), consideration given in the form of an assumption of liabilities (or a receipt of property subject to a liability) shall be offset against consideration received in the form of an assumption of liabilities (or a transfer subject to a liability). See § 1.1031(d)-2, examples (1) and (2). Examples (1) and (2) of section 1.1031(d)-2, Income Tax Regs., illustrate the above-quoted rules, and, at Example (2)(c), add the following corollary: Although consideration received in the form of cash or other property is not offset by consideration given in the form of an assumption liabilities or a receipt of property subject to a liability, consideration given in the form of cash or other property is offset against consideration received in the form of an assumption of liabilities or a transfer of property subject to a liability. * * *↩
13. This analysis of "what could have been" assumes that the loan and exchange transactions would have been respected for tax purposes and not collapsed under the step transaction doctrine. For a classic application of the step transaction doctrine, see Gregory v. Helvering,293 U.S. 465↩ (1935).
14. In the statutory notice, respondent treated the $22,080.37 gain petitioner must recognize from the exchange transaction as ordinary income. Respondent supports his position by pointing out that the parties have stipulated that prior to June 30, 1978, petitioner had claimed depreciation deductions on the old tractors aggregating $45,812.72, and that petitioner's $22,080.37 recognized gain on the exchange must therefore be characterized as ordinary income under sections 1245(a) and 1245(b)(4). Petitioner does not dispute respondent's analysis and we agree with it.↩